BACHMAN V. THE PEOPLE.

1. Where the evidence is conflicting, and the verdict not manifestly against the weight of evidence, the verdict will not be disturbed, and where there is a direct conflict, it is the province of the jury to determine to whom credit should be given. These rules contemplate a conflict between the testimony of witnesses produced for the respective parties litigant.

2. In a criminal prosecution for larceny, where the evidence is conflicting between the witnesses of the people, and the verdict being manifestly against the weight of evidence, it will be set aside.

3. A bare preponderance of proof is not sufficient to convict one of an infamous crime; if there be no probable hypothesis of guilt consistent, beyond a reasonable doubt, with the facts of the case, the accused must be acquitted.

*Error to District Court of Elbert County.*

THE facts are stated in the opinion.

Mr. HENRY B. O'REILLY, for plaintiff in error.

Attorney-General T. H. THOMAS, for defendant in error.

BECK, C. J.   The defendant below, Frederick Bachman, was indicted for the crime of grand larceny at the March term, 1884, of the district court of Elbert county.   He was tried and convicted at the same term, and sentenced to serve a term of one year and six months in the state penitentiary.   The offense for which the defendant was convicted was that of stealing a heifer from the prosecuting witness, August Ehler, on the 5th day of November, A. D. 1883.   Before sentence the defendant moved the court for a new trial: the principal grounds of the motion being insufficiency of the testimony to sustain the verdict and newly-discovered evidence.   This motion was denied, and exceptions to the ruling taken.   The defendant, Fred. Bachman, and the prosecuting witness, August Ehler, are both prominent and well-to-do citizens of Elbert county.   Both are possessed of large stock ranches,

and both have for years been engaged in the raising of cattle and other stock. More than this, they are neighbors, their ranches adjoining and being separated only by a division fence constructed of wire. Mr. Ehler's house is three-quarters of a mile from this fence in one direction, and the defendant's house one mile therefrom in an opposite direction. At the time of the alleged larceny the defendant was not residing upon his ranch, but resided with his family at Kiowa, a few miles distant. On November 5, 1883, defendant was upon his ranch, and drove a red heifer, having white color marks, from his pasture into his corral, and butchered her for beef for his own use. Ehler was informed that this was his heifer, the information coming through John Bachman, a nephew of the defendant, in his employ; whereupon Ehler caused the defendant to be arrested and held to bail, and afterwards to be indicted and tried for grand larceny. Ehler and the defendant had been enemies, according to the testimony of the former, for about eight years, and sharp words had passed between them about a month previous to this occurrence. This nephew had been in the employ of the defendant ever since his arrival here from Germany, a period of about sixteen months. He witnessed the defendant driving up the heifer into the corral; also the killing; and obeyed the call of the defendant to bring the team with which he was working, and to drag the heifer up to the skinning-post.

The conviction of the defendant was due largely to the testimony of this nephew, and to a singular circumstance, the happening of which was proven, but there was no proof connecting the defendant therewith. This circumstance was the cutting out from the left side of the hide, from the shoulder to the tail, a strip six or seven inches wide, which probably contained the brand; also the removal of that part of the hide which covered the head and contained the horns and ears. It is probable,

also, that the portion which had covered the legs below the knees and hocks had likewise been cut off, since they did not appear upon the mutilated pieces. In addition to all this, the skin had been cut into two pieces, and was found hanging up in the goose-house, an old log building belonging to defendant, which adjoined the corral, and had neither doors nor windows, but openings therefor only, and into which building any passer-by could look or enter at pleasure. The act of slaughtering the heifer was done openly, and the defendant has never denied the same, nor any circumstance connected therewith, which in our judgment has been established by sufficient proof to be contrary to the defendant's version or statement. He has persistently asserted, however, both on and off the witness stand, that the heifer was his own property; that it bore his brand and ear-mark; that it was born in his pasture, and had never been out of it, and that he had full right to kill it as he did for his own use. He testified that it was eighteen months old, and that the only brand upon it contained the letters " F. B.," which was his brand; also that the left ear was cropped, which was his ear-mark. He testified that his nephew was using a team, working upon a ditch forty or fifty rods distant from the corral, when he drove in the heifer, and that, after shooting her, he called to him to bring the team up, and drag the animal up to the skinning-post. In the meantime he had separated the skin along the belly, and had skinned and cut off the legs. He had not touched the ears. After the animal was put in position at the post, he and his nephew took off the entire hide in one piece, including the skin of the head, neck and legs. The latter were skinned nearly to the hoof. He hung the hide upon a fence-board, in the corner of the corral, just as it came from the animal. Next morning he went to Kiowa, and the nephew went to Bijou. When defendant left the ranch, the hide was in the same condition as upon the evening previous. He was not certain which left

the ranch first, himself or his nephew. He did not again
return to his ranch until the second Sunday after the
election, which would be November 18th, when he found
the hide in the goose-house adjoining the corral, cut up
as described by the witnesses. Defendant says he did not
cut up the hide, and don't know who did; he thinks the
pieces found are parts of the hide taken from the heifer
he killed. His testimony appears to be straightforward;
and no attempt at evasion, or the making of testimony
in his favor, is discernible. He produced the mutilated
hide upon the trial; and had the fact been proven that
defendant had mutilated the same, there would remain
no reasonable doubt of his guilt, for the brand and ear-
marks had evidently been removed in such a manner as
to indicate that it had been done to destroy the identity
of the hide with that of the animal from which it had
been taken.

John Bachman, who circulated the report that his
uncle had killed Ehler's heifer, says, in his testimony
upon the trial, that he saw the hide hung up in the corral
on the same evening the animal was killed, and also the
next morning, and that it was on both occasions whole
and not mutilated. He says he went to Bijou the morn-
ing of the 6th of November, leaving his uncle at the
ranch; and when he returned late in the evening, his
uncle was at Kiowa. Nobody else was on the ranch
when he left in the morning, but a herder had come
there while he was away, on the morning of the 7th.
He saw the hide in the goose-house, mutilated as before
described. His testimony as to the manner of skinning
it off the animal was that the entire hide was taken off
in one piece, including the head and the legs, to the
knees and below the knees. He denied that he assisted
in the skinning. He says he knew the animal to be
Ehler's, and that it had Ehler's brand, "I. E.," upon it;
but he did not see the brand upon the animal before it
was skinned, or upon the hide after the same was re-

moved from the animal. At the time he hitched the team to the hind legs to draw the carcass up to the post, he noticed the right ear had been cut off, but did not see the ear. He admitted that he had told Christ Vogt that both ears had been cut off at that time, but he was mistaken; only the right ear had been cut off.

It will here be observed that the ear-marks of both Ehler and the defendant were upon the left ear; Ehler's being an "under-bit," as he describes it, and the defendant's a cropping of the left ear.

An examination of the testimony given by the witnesses on part of the people shows it all to have been of this uncertain and contradictory character. All statements of fact upon which they agreed, and did not afterwards themselves contradict, may be true, and at the same time be consistent with the defendant's innocence, save the positive testimony given by John Bachman on the trial, nearly all of which, however, is rendered unworthy of credit by contradictions by himself on the witness stand, and by proof of statements made by him on other occasions contrary to his testimony at the trial. For example, according to the testimony of John Hoffman, a witness called by defendant, John Bachman first declared his belief that the slaughtered animal was Hoffman's cow. The witness Hoffman says he had in his possession a cow belonging to the defendant, in the months of October and November, 1883; that he lost her early in November, and was hunting her. Meeting John Bachman a few days after the election of November 6th, the latter told him he believed the defendant had killed his cow. Witness replied that the cow he was hunting belonged to the defendant. This witness further testified that he, said Hoffman, was then working for defendant, and knew he had not killed a cow, but had killed a heifer; also that witness had subsequently found the cow he had lost, when John Bachman admitted that he was mistaken. John Bachman says he told Vogt, on the 13th

day of November, that his uncle had killed Ehler's cow. Vogt communicated this information to Ehler on the 18th day of November.

Vogt was not a witness upon the trial, but Ehler's account of that interview is that Vogt called upon him on Sunday, November 18th, and asked about his own cattle, which were being herded near by, and, having been told by Ehler they were all right, he then asked if his (Ehler's) cattle were all right. Ehler replied that he did not know, but was going out to the pasture to see. This was thirteen days after the heifer had been ·converted into beef; and if his answer to Vogt was true, he had not then discovered his loss. In almost the next breath, the witness, Ehler, acknowledges that the latter statement was untrue; for he says he had ascertained November 17th (which was the day before) that he had lost two animals, a steer and a heifer. But upon his reply to Vogt that he did not know whether his own cattle were all right, the latter gentleman told him that if he would go down to the defendant's goose-house, he would find the hide of one of his animals hanging up there; that defendant's nephew had told him so. Upon Ehler's attention having been called to this inconsistency in his testimony, and being asked why he did not inform Vogt of his loss if he had discovered it the day previous, he gives the following excuse: That defendant and he were in trouble. He knew he could not prove anything, and defendant would proclaim that he (Ehler) had accused him of stealing. This was a novel explanation, especially so in view of the fact that he told three other persons next day that Bachman had stolen his heifer, and took them to the goose-house to see the mutilated hide as proof thereof. His first visit to the goose-house was about half an hour after receiving the information from Vogt. He says the hide was cut into two pieces; that the part of the hide the brand was on was missing. It was cut up from the left shoulder and behind the legs, and circled clear around the brand,—

a strip five or six inches wide; says the brand on the heifer was five inches wide,— the skin of the head was gone,— no ears at all. * * * The hide was preserved down to the knees only. He further says that he hunted around, and found the legs near the spot where the animal had been killed, and that they had not been skinned below the knees; that the front feet were red, the hind feet white. He swears positively that when he saw the two pieces of the hide and the legs he knew it was his heifer that had been killed.

It is a singular fact that nobody else saw these legs. The defendant says he skinned the legs down almost to the feet, and then boiled the legs for the oil and meat they contained. Not one of the three persons taken by Ehler next day to see the evidences of defendant's guilt saw these legs. Ehler says he forgot to show the legs to these witnesses, although it appears from his testimony that the discovery of them, with the familiar red upon the front feet, and white upon the hind feet, left no doubt remaining in his mind that it was his heifer the defendant had killed.

Benedict Marke, one of these witnesses, stated, when testifying on part of the people, that he looked around the corral for the feet and ears, but saw nothing of them, and that Ehler did not tell the parties present that he had seen them the day before. The same is true of the other two witnesses; neither of them saw the legs. Even the informer, John Bachman, who was mainly instrumental in procuring his uncle's conviction, testified on the trial that he remained and worked for defendant ten days after the killing of the heifer, but saw nothing of the legs. August Ehler is the only witness who testified to the contrary. It would seem from his testimony that he saw the legs also upon the second visit, when all three of the above-named witnesses were present; for he not only says he forgot to show them to the witnesses, but that he just walked by and saw them, but did not know

whether the others saw them or not. Considering the mission upon which Mr. Ehler went on the second day, and his object in taking the three persons with him, it is not a little strange that he should have forgotten to show them these important items of evidence, which had proved so conclusive of the defendant's guilt in his own mind.

This witness testified to a minute description of his missing heifer, including age, size, color and color-marks, from the white spot in the forehead to the color of the brush of the tail, which he says was white. He had twenty-six other animals of the same age, but admitted he could not describe any of them with the same precision. The reason he remembered the description of this one so well was that it was his best heifer, and was from a cow he had milked the previous summer. He then admitted he had milked five cows the previous summer, and that this heifer and a calf from another cow were so nearly alike that, although the color-marks were somewhat different, he could only tell to which cow each belonged when he saw them together. Regarding this description, he stated further that he gave it from his memory of it as a yearling; that he lost his familiarity with the heifer during the previous winter. In this statement he seems to have overlooked another statement made by him, viz., that he had seen and recognized this heifer eight days before it was killed, and had turned it, with a band of fifteen others of the same age, into his pasture. That was on October 28th. If John Bachman tells the truth, this heifer was in his uncle's pasture on the same day Ehler found it with the band upon the creek, and turned the whole band into his pasture. We have seen that Ehler made contradictory statements as to when the discovery was made that he had lost this animal. One statement was that the discovery was made November 17th, and the other that he knew of no loss on November 18th, until he received the information

from Christ Vogt. It would seem, however, that his suspicion that the defendant had stolen this heifer was considerably in advance of his information or knowledge. On November 7th he noticed that an animal had been driven through the wires of the partition fence, apparently by a man on horseback. There were tracks of a horse inside, the under wires broken down, indicating the passage of a small animal from his pasture into Bachman's, and hairs were to be seen on the wires. Upon seeing these indications he expressed his suspicion thus: "I suspected defendant had driven that animal through that fence." With such a suspicion in his mind, November 7th, it is singular that it was necessary for him to tell Vogt, November 18th, that he didn't know whether his cattle were all right, but that he would go out to the pasture and see. Another instance of the inconsistency of Ehler's testimony is his answer to the question whether he had talked with John Bachman before filing the information against the defendant. He answered that he had not, and that the first time he saw him was in the court-house on December 1st. He afterwards admitted that he saw John Bachman at defendant's ranch on Monday, November 19th, when he took the three witnesses there to view the mutilated hide, and asked him who killed that heifer, and that he answered, "*Fred. Bachman killed it.*"

The reckless inconsistency of August Ehler's testimony is only equaled by the contradictory and improbable statements of John Bachman. We have already adverted to the fact that, according to the testimony of an unimpeached witness, he first reported that the animal killed belonged to John Hoffman; and, after that animal had been found, he admitted that he was mistaken, and afterwards declared it was Ehler's animal that had been butchered. He said on the trial that the hide was not mutilated when hung up in the corral on the evening of November 5, 1883, and that it remained in the same condition next

morning. He stated, also, that he knew the animal slaughtered to have been Ehler's, and that it bore his brand, "I. E.," on left side. But he says he did not see either brand or ear-mark at the time of the killing. He brought his team and dragged the heifer up to the post, and saw the hide then and after it was hung up in the corral, both that evening and next morning; and although he was satisfied it was Ehler's heifer, he made no examination of brand or ear-mark. He described the animal as red, with a white belly; says when Fred. commenced to drive her to the corral she was with the herd, a quarter of a mile distant from him, and that he recognized the cow that distance. She had been in the pasture eight days. He had seen her every day; had examined her six times, and knew that she belonged to Ehler. He knew when he saw it shot that it was the one he had seen in the pasture with Ehler's brand upon it. The explanation which he gives for not examining the hide for brand and ear-marks is that Fred. would not have liked it, and he could not examine it without Fred. seeing him. He admits he told Vogt that when he came into the corral where Fred. was skinning her that both ears had been cut off, but says he was mistaken; that only the right ear had been cut off. What object defendant could have had in view in cutting off the right ear when both his own and Ehler's ear-mark was upon the left ear is not explained. He says he told Vogt that the bag of the heifer had been cut off; but he was mistaken as to this fact also.

Witnesses sworn on behalf of the defendant testify to what John Bachman had previously sworn to on the preliminary examination before the magistrate; most of which John denies. G. A. Wood, a cattle raiser, living at Kiowa, says he heard his testimony on that occasion, and he swore he did not know what brand was on the animal, and that he did not know what Ehler's brand was. George Farran, who had resided in Elbert county since

1864, and who acted as interpreter for John Bachman in the preliminary examination, says that when the witness was testifying about the brand, at one time he said he knew it, and at another time he said he did not know it, according to the question. He didn't think he discovered Ehler's brand on that occasion. This witness, being asked on cross-examination the following question, "Did he say he never saw the brand, and didn't know the brand on the animal?" answered, "He didn't say it in the same words and manner you do, though it seems to me now that he expressed that." He said he knew the ear-mark better, and knew the animal to be Ehler's. In answer to another question, witness thinks John Bachman said he didn't know whose animal it was. Rhine-hart Mattesius swears he met John Bachman two days after the preliminary examination, when he told the witness that he was not then working for his uncle, as he had sent him off because he had testified that he killed Ehler's heifer. Witness asked him if he had done so, and he answered, "Yes; I had to say so or Fritz Vogt would send me to the penitentiary."

Upon a review of the whole testimony and the circumstances in evidence, taking into account the situation of the parties, prosecuting witness and defendant, with regard to character, business experience and success, their social relations, the manner in which this charge against the defendant originated, and the contradictory and improbable character of the testimony produced to support the same, we are of opinion that the proof is wholly insufficient to sustain the verdict and judgment.

It is wholly improbable that a man of the business ability and experience of defendant would, if guilty, so mutilate a hide as to destroy its value, for the purpose of avoiding detection, and then hang the worthless fragments in a conspicuous place, where every passer-by could see and examine them; especially when the object of the mutilation was apparent upon the slightest examination.

The proof that the heifer killed by Mr. Bachman was the property of Mr. Ehler is equally unsatisfactory. A feud of eight years' standing had existed between Ehler and the defendant. Ehler was ready to suspect the defendant of driving off his stock several days before he learned from John Bachman, through Vogt, that he had lost an animal. His *animus* and prejudice, as well as the inconsistency of his testimony, appears throughout the case. Admitting that he had lost a heifer, his testimony that the defendant had taken or killed it is anything but positive or satisfactory. The fragments of the hide found in the goose-house were of such an ordinary description that the same might have been taken from animals in any herd. His statement of finding the legs unskinned, and that he recognized them, is remarkable, since neither John Bachman, the informer, who lived on the premises, nor either of the three witnesses taken by Ehler to see the proofs of defendant's guilt, ever saw them after the animal had been killed. That Ehler forgot to show these proofs to his witnesses, under the circumstances, is also remarkable.

This court and other courts have often said that where the evidence is conflicting, and the verdict is not manifestly against the weight of evidence, it will not be disturbed; also that where there is a direct conflict in the evidence, it is the province of the jury to determine to whom credit should be given. There is a serious conflict in the evidence here, but it is principally between the witnesses on the part of the people and between the several statements of each of the two witnesses upon whose testimony the defendant was convicted, John Bachman and August Ehler. The rules referred to do not contemplate a conflict of this character, but between the testimony of witnesses produced for the respective parties litigant. We also regard the verdict as manifestly against the weight of the evidence, when analyzed and its weight ascertained.

There are, however, other rules to be considered, when applicable; as that a bare preponderance of proof is not sufficient to convict one of an infamous crime; that if there be no probable hypothesis of guilt consistent, beyond a reasonable doubt, with the facts of the case, the accused must be acquitted; also that a court of review may award a new trial in criminal cases, whenever in its judgment a conviction is not warranted by the proof. It is also to be remembered that the law presumes the character of the defendant to be good. His course, throughout this whole prosecution, appears to conform to this presumption. Concerning the mutilation of the hide it is certainly quite as probable, from a review of the whole case as presented by the record before us, that it was the act of a conspirator, as that the defendant committed so silly an act as this was shown to be.

Mr. Wharton says: "The fact of the commission of the offense must necessarily be the foundation of every criminal suit, and until that fact is proved, most dangerous would it be to convict;" to which he cites *State v. Davidson*, 30 Vt. 377; *Smith v. Com.* 21 Grat. 809; *State v. Keeler*, 28 Iowa, 553; *People v. Bennett*, 49 N. Y. 137.

In consideration of the peculiar features of this case, at least one of the affidavits filed in support of the motion for a new trial below, on the ground of newly-discovered evidence, would seem to be in point and should have been considered favorably. The affidavit of George T. Kathrons alleged that he visited defendant's ranch early in November, hunting lost stock, and that he saw a green hide hanging up in the corral; that he examined it, and it bore the brand "F. B." upon it (Bachman's brand), and no other marks; that he noticed that it was not mutilated at this time. There were other affidavits filed concerning newly-discovered evidence that we do not deem necessary to refer to. Defendant alleged in his affidavit upon this motion that he knew nothing of the visit of Kathrons to his ranch at the time stated in his affidavit, nor of the

information possessed by him, until after the trial. This affidavit bears directly upon a point not by any means satisfactorily established by the prosecution. It is therefore not without weight in passing upon the regularity of the proceedings.

We regard the evidence insufficient to sustain the verdict and judgment; and, it appearing upon inspection of the entire record that the conviction and sentence are not warranted, the judgment is reversed, and the cause remanded for further proceedings.

*Reversed.*