# January Term, 1910.

[No. 6464.]

## John Ausmus and Zara Moon v. The People.

1. **Criminal Law—Information—Verification** — The affidavit verifying an information as required by Mills' Stats., sec. 1432h, need only set forth the offense and name of the person or persons accused. It need not set out the mode or manner in which or the means or instance by which it was accomplished.—(175)

An affidavit attached to an information declaring that "the facts stated in the foregoing information are true, and the offense charged therein was committed of affiant's own knowledge," is as effectual as an averment of the truth of the matters of fact alleged in the information, as though every statement of the information had been embodied in the affidavit.—(176)

2. **Criminal Law—Corpus Delicti**—The corpus delicti, in an accusation of murder, does not include the guilt of the accused or the identity of the murdered person.—(180)

Evidence of the finding of a dead body lying upon its face, entirely clothed, buried in the sand and with a wound through the skull which could not have been self-inflicted, establishes the corpus delicti.—(180, 181)

3. **Criminal Law — Circumstantial Evidence** — Where, upon an accusation of murder, the corpus delicti is established, the identity of the murdered person and the guilty agency of the accused may be shown by circumstances.—(181)

Circumstances in evidence examined and held sufficient to justify a conviction of willful murder.—(181-183)

4. **Criminal Law—Evidence—Admissibility** — An attempted contradiction is properly excluded where it is not made to appear that the two witnesses refer to the same occasion.—(183-184)

In the same case it was claimed by the defense that the person alleged to have been assassinated, one McDowell, had, in fact absconded, and the defense offered evidence that, after his disappearance, one Daly had made claim to a horse sold by Mc-Dowell before his disappearance, to one Carston. The evidence was offered to establish a motive on the part of McDowell to conceal his whereabouts. There being no evidence that McDowell was ever accused of the theft, or that Daly ever asserted any

(167)

claim to the horse until after McDowell's disappearance, the evidence was held irrelevant.—(184)

In the same case the defense, to sustain the same contention, offered to prove that McDowell, in filing upon the claim where he lived, had stated that he only wanted to control the water, that he "might have to leave in fifteen minutes and light out." Held that, not accompanying any act of deceased which it might explain or characterize, the statement was inadmissible.—(185)

5. **Evidence—Handwriting—Comparison**—An expert in handwriting may depose as to the authenticity of the handwriting in question, though he acquires his knowledge of the writing of the person to whom it is ascribed merely by examination of specimens proven or admitted to be his genuine handwriting, such specimens being produced in court and the witness comparing them and stating his conclusions as to their similarity or dissimilarity.—(191)

6. **Experts—Qualification**—An expert is one having superior knowledge of a subject, acquired by professional, scientific or technical training, or by practical experience. The weight of authority is that the decision of a trial court as to the qualifications of an expert is never reversed except in case of abuse. —(188)

7. **Expert Evidence on Handwriting — Signature — Comparison**—In the same case the authenticity of a bill of sale alleged to have been executed by McDowell, by affixing as his signature "XX," being in question, it appearing that McDowell uniformly affixed as his signature a mark having many peculiarities and such as to make it well known as his mark, it was held that an expert in handwriting, having compared this with certain checks admittedly subscribed by McDowell, might give an opinion upon the question. The court approved the doctrine of State v. Tice, 30 Ore. 457, 48 Pac. 367, 369, that, "Considering the manner in which marks of persons incapable of writing are usually made by merely touching the pen while the scrivener forms the character, it is doubtful whether any person ought to be allowed to identify such marks as a writing."—(196, 197)

8. **New Trial—Disqualification of Juror**—The finding of the trial court, upon full hearing, that a juror had not disqualified himself by the formation of a previous opinion, will not be reviewed.—(197)

9. **Presumptions—Of Law and Fact**—There is but one kind of presumption, that of law. The term "presumption of, fact" is misleading and should be discredited.—White, J.—(199-201)

**10. Instructions—To Be Construed as a Whole—**An instruction that, when a conspiracy is shown beyond a reasonable doubt to exist the acts and statements of one of the conspirators in furtherance of the conspiracy and during its existence, are admissible against the other conspirator, and if against interest, "are presumed in law to be true by reason thereof," is, standing by itself, fatally erroneous, as invading the province of the jury, but the error is purged by other instructions in which the true rule is plainly stated.—(197-203)

*Error to Morgan District Court*—Hon. H. P. BURKE, Judge.

Mr. M. M. HOUSE, and Mr. RALPH TALBOT, for plaintiffs in error.

Hon. WILLIAM H. DICKSON, attorney general, Hon. J. T. BARNETT, attorney general, Mr. GEORGE D. TALBOT, and Mr. S. H. THOMPSON, Jr., for the People.

Mr. JUSTICE WHITE delivered the opinion of the court:

From the year 1899 to April, 1904, a man known as Robert B. McDowell, lived in Morgan county, Colorado. He was about forty-five years of age, approximately six feet tall, had brown hair, a protruding forehead, prominent cheek bones, stooped a little and was either bow-legged or had a bow-legged appearance. He carried a pocket knife described by the witnesses; also carried about his person a trunk key, fastened to a leather strap of a certain size, attached to the waist band of his pants; owned a certain kind of door key to the lock on the door of his house; was in the habit of tieing his shoes with a peculiar bow-knot, and wore a number eight or nine shoe; was unmarried, and for most of the time resided at his ranch on the Wild Cat creek, some eight or ten miles from Fort Morgan, where he had filed upon 160 acres of land as a homestead, and had made

improvements on 640 acres of school land leased from the state, where he ran horses and cattle and had accumulated some other property. He was illiterate, could neither read nor write, and of his history prior to 1893, when he lived in Las Animas county, this state, nothing of certainty is disclosed by the record, though it appears he came from Texas. During the month of April, 1904, McDowell disappeared. Prior to and immediately preceding said date, plaintiffs in error were upon and about the McDowell ranch and on the 26th of that month John Ausmus, one of the plaintiffs in error, under a power of attorney, or pretended power of attorney, dated April 14th and signed with McDowell's name by two XXs, and witnessed by the other plaintiff in error, Zara Moon, sold and delivered of McDowell's property 140 head of cattle and twenty-six horses to Munn & Raugh for $1,440.00, being considerably less than their real value. Ausmus explained to Raugh that McDowell had to get out of the country, and was then in hiding, which was the reason that he, Ausmus, was to sell his cattle. Munn suggested the giving of a draft payable to McDowell for the purchase price of said property. Ausmus objected to such means of payment, insisting on the cash, stating that McDowell was hiding out and wanted to get out of the country, and needed the cash. Munn then wrote out a bill of sale with a receipt thereon for the money, and gave the cash to Ausmus and asked him to have McDowell sign the bill of sale and receipt at the time the money was paid over to him and return the bill of sale and receipt to Munn. Several days thereafter the bill of sale and receipt were brought back to Munn purporting to have McDowell's name signed thereto with two XXs to each and witnessed by signatures of both Ausmus and Moon. A little later plaintiffs in error took possession of the premises and improvements

and property of McDowell, where he had formerly lived, distributing the same between them. The lease to the school land was renewed in the name of Ausmus.

In March, 1904, one Jacob Jochim, a young man about twenty years of age, worked for McDowell, during which time the plaintiffs in error visited the McDowell ranch and remained over night. Ausmus had a camp about one mile south of McDowell's ranch. When Jochim quit work for McDowell about March 28th the latter was owing him $18.00 for wages and arranged to send it to the former at Snyder, Colorado, from Fort Morgan. Not having received the money, about April 15th Jochim visited the McDowell ranch; was unable to find McDowell, but entered the house and there observed his household property; subsequently Jochim met Ausmus and informed the latter of his visit to McDowell's ranch to collect the debt, and thereafter Ausmus paid the bill, saying that McDowell had given the money to him with instructions to deliver it to Jochim. McDowell had, however, at Fort Morgan on the 28th of March purchased a draft for $18.00 to be sent to Jochim at Snyder, through a new cashier of the bank unacquainted with the spelling of the name Jochim, and who had written the name "Yocum" and mailed the draft enclosed in an envelope so addressed, and the same was in due course of mail returned to the bank, where it remained, but McDowell was not apprised of that fact. It also appeared that McDowell had at the time of his disappearance on deposit to his credit in one of the banks about $85.00, which remained uncalled for at the date of the trial. Also other accounts due him were never called for.

In the spring of 1905 Jacob Jochim worked for Zara Moon on the McDowell ranch and discovered some human bones partly exhumed near the Mc-

Dowell house, in a gulch over which at times the water flowed and into which the sun intensely shone, and informed Moon of the find. Nothing was done, however, relative to the grave until January, 1907, when Jochim mentioned it to several people, and, being requested so to do, conducted them, including the coroner, to the place where the grave was. Upon digging into the soil at the bottom of the gulch the remains of a man about six feet tall were discovered and exhumed. The soft tissues and the ligaments, tendons and cartilages of the remains had disappeared, and decay had proceeded so far as to render it impossible for any one to recognize the features, or to identify the bones found in the grave. The skeleton showed a protruding forehead with prominent cheek bones and small feet; disclosed a bullet hole passing through the skull from the rear in such a manner that it could not have been self-inflicted and which was the cause of death. There was also discovered with the remains the following: a pocket knife, such as McDowell carried during life; a trunk key fastened to a leather strap attached to a cloth band, as McDowell had carried his; a door key, such as McDowell carried, which, on trial, fitted the lock on the door of his former home; a pair of shoes such as McDowell occasionally wore, the strings of which were tied by a peculiar bow-knot, such as McDowell used during life.

The plaintiffs in error were young men, ranchmen by occupation, the sons of respectable parents, Ausmus having a young wife whom he had married since the disappearance of McDowell, and Moon being unmarried. Neither had ever been suspected of crime, and both enjoyed splendid reputations as peaceful and law-abiding citizens. Moon, although a resident of Fort Morgan, in the summer after the disappearance of McDowell opened a bank account

with the First National Bank of Brush, a town some distance away, depositing $200.00 in cash; Ausmus did likewise, depositing $450.00 in cash and later $250.00 in checks. Brush was the home town of the latter. The parties purchasing the McDowell property of Ausmus were in the banking business at Brush, but not connected with the bank in which plaintiffs in error opened their respective accounts. The father and family of Moon claimed that Zara had earned this money by herding cattle. The wife of Ausmus explained that during the fall before McDowell's disappearance, Ausmus, to whom she was not then married, entrusted to her various sums of money from time to time, aggregating the amount deposited, and that she, though employed in a bank, had not deposited it, but kept it hidden in her room until about the time the money was deposited in the bank at Brush. A witness claimed that early in May, 1904, he had seen a party in the mountains who gave his name as R. B. McDowell, and said he could neither read nor write, and requested witness to write the name in a book and thereupon made his mark to the signature. This writing was not produced. Other evidence proper to a consideration of this case will be alluded to hereafter.

It was claimed that the body found in the grave was that of McDowell, and that he had been murdered. Suspicion pointed to John Ausmus and Zara Moon as the perpetrators of the crime, and they were arrested, given a preliminary examination before a justice of the peace, and discharged. Thereafter, and without further preliminary examination, a direct information was filed in the district court of Morgan county, under which plaintiffs in error were charged with, tried for, and convicted of the murder of said Robert B. McDowell. The jury found them guilty of the highest degree of the crime, and the evi-

dence being circumstantial, they were sentenced to the penitentiary for life, where they now are undergoing punishment. To reverse the judgment they prosecute this suit here and assign numerous errors.

1. It is contended that the court erred in overruling the motion of plaintiffs in error to quash the information, for the reason that no affidavit had been filed showing probable cause for their arrest, and because there was no affidavit upon which the information was based, plaintiffs in error having been discharged upon preliminary hearing.

To the information was attached the affidavit of William A. Sergeant to the effect that the facts stated in that instrument were true, and the offense therein charged was committed of his own personal knowledge, and that he was a competent witness to testify in the cause. It likewise had attached thereto an affidavit of James P. Austin to the same effect.

Under § 1432b, Mills' Ann. Stats., it is required that in all cases in which a preliminary examination has not been had or the accused discharged, there shall be filed with the information the affidavit of some creditable person, verifying the information upon the personal knowledge of affiant that the offense was committed. Unquestionably either of the affidavits attached to the information under consideration was a compliance with said section. A verification is a sworn statement of the truth of the facts stated in the instrument verified. Under § 1432h, Mills' Ann. Stats., it is provided that: "If a preliminary examination has not been had, or when upon such examination the accused has been discharged, * * * the district attorney may, upon affidavit of any person who has knowledge of the commission of the offense, and who is a competent witness to testify in the case, setting forth the offense and the name of the person or persons charged with the commission

thereof, * * * file an information, and process shall forthwith issue thereon,'' and it is argued that a compliance with this section is essential to meet the requirements of our constitution.—§ 7, art. 2. In this argument we concur with counsel, but not in their conclusions that the affidavits in question fall short of those essentials. The affidavits being attached to the information and particularly reciting that, "the facts stated in the foregoing information are true, and the offense therein charged was committed of his own personal knowledge," was as full and complete as if each and every fact contained in the instrument referred to as "the foregoing information" had been actually embodied in the affidavit itself. The information referred to, and thus made a part of the affidavits, contains five counts. The first charges plaintiffs in error jointly with the murder; the second charges that Ausmus committed the deed, and Moon, not being present, aided and abetted him; the third charges that Moon committed the murder, and that Ausmus, not being present, aided and abetted him; the fourth charges Ausmus with the act, and Moon with being present, aiding and abetting him, and the fifth charges Moon with the crime, and Ausmus with being present, aiding and abetting him.

The statute requires that the affidavit supporting the information "set forth the offense" and the name of the person or persons charged with the commission thereof. It need not set out the mode or manner of the perpetration of the offense, or the instrument or agency employed to accomplish the result. The details are unnecessary; the ultimate facts are sufficient. The offense is "set forth" in the information, and likewise the names of the persons charged with committing the offense, and by reference became and were included in the affidavits. We apprehend if the

affidavits, or either of them, attached to the information in question had set forth the offense in the particular language used by the district attorney in the information, no question would or could have been urged against their sufficiency. We are unable to appreciate the distinction between an affidavit made full and complete by reference to an attached instrument, and an affidavit having the particular matters so referred to embodied in the affidavit itself. Either is sufficient. When the district attorney presented to the court the affidavits in question, and the court read and considered them, he must have read and considered as a part thereof the language of the information to which they were attached, and to which they referred, and thus that language became and was read into and made a part of such affidavits, and formed the basis for the order to file the information. Clearly a false and malicious affidavit so embodying facts by reference would support a charge of perjury. Besides, the affidavits supporting and verifying the information under consideration, we find, by an actual inspection of the record on file in this court, are of similar form and of the same purport, substance and effect as was the basic affidavit for the information in the case of *Walker v. People*, 22 Colo. 415, and the affidavit was there held sufficient and the form approved. Nor do we consider that *Noble v. People*, 23 Colo. 9, or the language used in *Tuttle v. People*, 33 Colo. 256, in any wise militates against this view. Clearly the procedure under consideration was a compliance with the constitutional and statutory requirements in question, and deprived plaintiffs in error of no substantial nor technical rights.

2. Counsel contend that the *corpus delicti* was not proven, and set forth with great pains and much skill, at considerable length, parts of the evidence

which they contend establish that fact. They say: (a) That the leg of McDowell in life was broken below the knee; (b) That the bones of the skeleton introduced showed that neither leg had been broken in life, and that such break in life would have shown after death; (c) That McDowell was a badly and markedly bow-legged man; (d) That the leg bones introduced as those of the skeleton were straight; (e) That there was no affirmative evidence tending to contradict their theory that McDowell's leg was broken in life; (g) That the size of the shoes worn by McDowell in life were $8\frac{1}{2}$ to 9; (h) That the size of the shoes found with the skeleton were by exact measurement 7 in length and 5 in width; (i) That the soft tissues, the ligaments, cartilages and tendons were entirely destroyed. That this result could not have occurred in less than five years; that McDowell disappeared less than three years before the trial, and hence, these remains could not have been his; (j) That the color of the hair found in the grave was light red or brown, and that McDowell's hair in life was in color black or dark brown.

Unquestionably the *corpus delicti* in all cases of homicide must be proven beyond a reasonable doubt, either by direct or circumstantial evidence. The courts have held it to be a fundamental and inflexible rule of legal procedure that no person shall be required to answer or be involved in the consequences of guilt, without satisfactory proof of the body of the crime, either by direct evidence, or by cogent and irresistible grounds of presumption arising from the facts proven. Where there is no sufficient legal proof of crime, there can be no legal criminality.—*McBride v. People,* 5 Col. App. 91; *State v. Flannagan,* 26 W. Va. 116, 123.

Starkie on Evidence, § 863, announces the doctrine that even when the body has been found, and

(12)

although indications of a violent death be manifest, it shall be fully and satisfactorily proved that the death was neither occasioned by natural causes, by accident, nor by the act of the deceased himself.

By Anderson's Law Dictionary we find that: "The *corpus delicti* in murder has two components: death as the result, and the criminal agency of another as the means."

And in § 2072, Wigmore on Evidence, the following:

"The meaning of the phrase *corpus delicti* has been the subject of much loose judicial comment, and an apparent sanction has often been given to an unjustifiably broad meaning. It is clear that an analysis of every crime, with reference to this element of it, reveals three component parts; first, the occurrence of the specific kind of injury or loss (as, in homicide, a person deceased; in arson, a house burnt; in larceny, property missing); secondly, somebody's criminality as the source of the loss,—these two together involving the commission of a crime by somebody; and, thirdly, the accused's identity as the doer of this crime.

"(1.) Now, the term *corpus delicti* seems in its orthodox sense to signify merely the first of these elements, namely: the fact of the specific loss or injury sustained:    *   *   *   This, too, is *a priori* the more natural meaning; for the contrast between the first and the other elements is what is emphasized by the rule; i. e. it warns us to be cautious in convicting, since it may subsequently appear that no one has sustained any loss at all; for example, a man has disappeared, but perhaps he may later reappear alive. To find that he is in truth dead, yet not by criminal violence—i. e. to find the second element lacking, is not the discovery against which the rule is designed to warn and protect us.

"(2.)   But by several judges the term has been said to include the second element also."

The author then quotes from the case of *Commonwealth v. Webster*, Bemis' Rep. (Mass.) 473, as follows:

"In a charge of criminal homicide, it is necessary in the first place by full and substantial evidence to establish what is technically called the *corpus delicti*—the actual offense committed; that is, that the person alleged to be dead is in fact so; that he came to his death by violence and under such circumstances as to exclude the supposition of a death by accident or suicide, and warranting the conclusion that such death was inflicted by a human agent; leaving the question who that guilty agent is to after consideration."

And from *People v. Bennett*, 49 N. Y. 137, 143, as follows:

"The *corpus delicti* has two components, viz., death as the result, and the criminal agency of another as the means."

And then continues as follows:

"This broader form makes the rule much more difficult for the jury to apply amid a complex mass of evidence, and tends to reduce the rule to a juggling formula."

And then proceeds:

"A third view, indeed, too absurd to be argued with, has occasionally been advanced, at least by counsel, namely, that the *corpus delicti* includes the third element also, i. e. the accused's identity as the criminal. By this view, the term *corpus delicti* would be synonymous with the whole of the charge, and the rule would require that the whole be evidenced in all three elements independently of the confession.

"To illustrate the different definitions by the

various crimes, it would follow, under the orthodox definition, that in homicide the fact of death, whether or not feloniously caused, is the *corpus delicti;* in arson the fact of burning, whether or not wilful, and in false representations, the fact of the acting in reliance upon representations, whether or not they were false.''

It, therefore, follows that under either the orthodox rule as stated by Wigmore, or the broader sense in which the words are used, the existence of the criminal fact—the *corpus delicti*—in homicide may be completely established, before the question of identity of the slayer or slain is reached. Treating the agency of the accused as one element of the *corpus delicti* in its strict sense is certainly not in harmony with the proper use of that phrase. Ignorance of identity embarrasses the proof, and may cause a fatal variance; but proof of the *corpus delicti* may yet be complete, though ultimately the case fails for want of proof, either as to identity of the slayer or the slain. Certainly in the sense of a completed case, in which sense it is frequently used, it must include the identity of the accused as the criminal agency, and the identity of the deceased as the party alleged to have been murdered.—§ 311, 1 Wharton Crim. Law; *McBride v. People, supra.*

In the case at bar under either definition, we have ample proof of the *corpus delicti*—the existence of a criminal fact. A dead body is found with a bullet hole passing upward and forward and entirely through the skull from the rear and center, at the base of the brain; the body is in a gulch about thirty feet wide and fifteen feet deep, and is buried in the sand to the depth of about one foot or eighteen inches; it is lying on its face and clothed; there is no weapon with which the deceased could have inflicted the wound upon himself, and the point of penetration

and exit of the bullet is so located that it could not have been self-inflicted.   Under such circumstances an inference of accident or suicide is necessarily excluded, and the *corpus delicti*, even under the broader definition is fully established, although who is the slain, and who the slayer, is as yet shrouded in mystery.   The identity of the one and the agency of the other, like the *corpus delicti* proper, may be established by direct or circumstantial evidence sufficient to convince the conscience of the jury.   When that is done the case is complete.

Greenleaf in his work on Evidence, vol. 3, § 30, says:

"It is seldom that either the *corpus delicti* or the identity of the prisoner can be proved by direct testimony, and, therefore, the fact may lawfully be established by circumstantial evidence, provided it be satisfactory.   Even in the case of homicide, though ordinarily there ought to be the testimony of persons who have seen and identified the body, yet this is not indispensably necessary in cases where the proof of death is so strong and intense as to produce the full assurance of moral certainty."

Certainly the death of the particular person charged in the information to have been murdered should be distinctly proved, either by direct evidence of the fact, by an inspection of the body and its complete identification, or by circumstantial evidence strong enough to leave no ground for reasonable doubt.—Wharton on Homicide, § 629 *et seq.*

The assignment of error is the lack of proof of the *corpus delicti*, yet in the argument of counsel, and, in fact, they so state, the words are used in their non-technical sense, in the sense of a completed case. Besides, other assignments expressly question the sufficiency of the identification of the remains found as those of McDowell.   We will, therefore, advance

to a consideration of the question of identity as pre-
sented and argued.

The evidence was not conclusive that the leg of
McDowell in life was broken below the knee. When,
where or how the break occurred was not disclosed.
The extent of the evidence was that McDowell had
said that his leg was broken, and that certain parties
had seen a protrusion or lump upon the leg so desig-
nated. On the other hand, others with equal oppor-
tunity of observation, had seen nothing of the kind,
and with equal or more intimacy and association had
heard no complaint. Besides, it is a matter of com-
mon knowledge that whether in certain cases a limb
is broken, though the party of whom it is a member
may fully believe so, can only be positively ascer-
tained by means of a thorough surgical or even an
X-ray examination. Nor does the evidence show
conclusively that McDowell was a bow-legged man.
Unquestionably he had that appearance, but wit-
nesses testified that all cattlemen accustomed to rid-
ing the range, such as McDowell was, assume that
appearance.

The known shrinking effect of the natural ele-
ments upon leather long exposed thereto, and the
uncertainty as to the measurement of shoes, renders
the apparent discrepancy as to the size of the shoes
worn by McDowell, and the alleged size of those
found with the skeleton, of but little value.

Neither can we concur in the assertion of counsel
that the evidence showed that the soft tissues, liga-
ments, cartilages and tendons of the body, could not
have been consumed and disappeared in less than five
years. On the other hand, there was much evidence
that that result might have been brought about in
much less time than had intervened since McDowell's
disappearance and the disinterring of the skeleton,
under the peculiar conditions and circumstances sur-

rounding this body.  It was a sudden death, the body interred at the shallow depth of twelve or eighteen inches in a gulch, the soil of which was impregnated with alkali, and over and through which water frequently flowed, and into which the sun intensely shone.  Under such circumstances the mind is irresistibly impelled to the conclusion that the soft tissues, ligaments, cartilages and tendons would rapidly and soon disappear.  The alleged difference in the color of the hair had no significance.  The evidence discloses that the effect of alkali upon hair is to lighten its color.  Besides, the color of McDowell's hair was given by various witnesses as light, light brown, brown and dark brown, and of that found with the skeleton light brown.  The claim that McDowell had been seen in the mountains after his alleged disappearance was evidently given but little credence by the jury.  His alleged action was so remarkable and inconsistent with the theory of the defense that McDowell was in hiding, as to render the story unworthy of belief.

But above all else the jury were the sole judges of disputed facts, and the facts pertaining to these matters were in dispute.  This court cannot usurp the province of the jury, whose duty it is to ascertain the truth from conflicting testimony.  The identity of the deceased was a question for the jury, and we cannot lawfully, under the circumstances, for there was ample evidence of identification, interfere with that conclusion.—*Bashman v. People,* 8 Colo. 472, 483; 21 Cyc. 1029.

3.  It is contended that prejudicial error arose by reason of the rejection and acceptance of certain evidence.

(a) A witness for the people, Mrs. Sadie Berry, testified without objection that John Ausmus and McDowell "had a fuss one evening when we was

working there the last time. Ausmus had a gun. Ausmus was cursing McDowell. Ausmus came into the house, and sat down and held the gun in his lap.'' She further testified that Ausmus stayed at McDowell's one or two nights, and was there several times, but did not fix the particular time when the quarrel occurred.

Jacob Jochim, called for the defense, testified Ausmus stayed all night at McDowell's but once, while Mrs. Berry was there, and plaintiffs in error undertook to prove by such witness that he was present that night, and that no such quarrel occurred. Objection to the testimony was interposed and sustained. The action of the court in the premises is · assigned as error. There is no merit in the assignment. Mrs. Berry was not asked, nor did she state, who was present at the time the gun play occurred, nor did she fix the time, except ''one evening.'' Clearly the evidence offered and refused was not admissible.

(b) Plaintiffs in error offered to show by D. H. Dailey that in June, 1903, he bought of McDowell a horse and in October, 1904, Charles Carston went to Dailey and claimed the animal and he repurchased the horse of Carston, thus showing, as counsel contended, that McDowell was guilty of having stolen the horse, and that he might be prosecuted for the larceny of live stock, thus establishing a strong motive for him to conceal his whereabouts. Upon objection the court refused the offered testimony and error is assigned upon the action of the court. We do not think it was error to exclude this testimony. It was in no wise relevant. As said by the court in excluding it: ''If it were established in every particular as strongly as it is offered, it might not prove anything at all.'' It was not shown that McDowell had ever been accused or charged with the

theft of this horse, nor did the alleged true owner thereof make claim to it, until months after Mc-Dowell's disappearance.   Besides, such evidence of ownership was clearly hearsay, and was inadmissible by reason thereof, if for none other.

(c) Plaintiffs in error offered to prove by witness Gilbertson that at the time McDowell filed upon his homestead he stated to witness, "that he didn't care about the land; what he wanted was the control of the water; that when he got ready to leave he might have to leave in fifteen minutes, and light out"; to which offer objection was interposed and sustained, and the action of the court in that regard constitutes one of the alleged errors urged.

It is argued that this is a circumstance in support of the statement of Ausmus and Moon made to Raugh and Munn, the cattlemen, to the effect that McDowell was hiding out in the hills, and was about to leave the country, and was afraid to be seen; that it might have had some weight to show the possibility of his voluntary departure from the state as against the possibility of his death.   The declarations offered as evidence were in no wise a part of the *res gestae*.   They were not accompanied by any act of the deceased which they might characterize or explain, but were mere statements of a possibility. Bishop in his work on Criminal Procedure (3d ed.), § 623, after stating that the deceased is not a party to the prosecution and his utterances are hearsay, says:

"The declarations of the deceased, as of any other third person, when not of the *res gestae,* or dying declarations, or communicated to the defendant so as possibly to influence his conduct, are excluded by rules which have been supposed to promote justice on the whole; at all events, which have become parts of the common law not within the discretion of

the courts to set aside. Hence they are not admissible.''

In *Commonwealth v. Felch*, 132 Mass. 22, the defendant was indicted for murder, resulting from abortion produced by him. It was claimed by the defendant that the deceased had performed the abortion on herself, and in support of this position he called a witness, and offered to prove that a short time before the alleged offense, the deceased told her that she was pregnant by one Titcomb, and that if Titcomb did not perform an operation to procure a miscarriage, or get some one to do so, she would perform the operation on herself. The offered evidence was refused and the supreme court in upholding the ruling said:

''The evidence tendered by the defendant in this case is what is recognized as hearsay evidence. Such evidence is generally inadmissible. * * * The fact that the purposes and intentions of the deceased would be, if known, a material aid in coming to a correct conclusion, does not permit such purposes and intentions to be found upon incompetent evidence. * * * If the government had called Hughes (the witness) and offered to prove by her that the deceased had told her in June that she was pregnant by the defendant, and he had agreed to perform the operation, would it be contended that the fact thus offered to be established could be proved by that evidence?''

So in the case at bar. If the state had called this identical witness and offered to prove that McDowell had told him that he, McDowell, was filing upon this homestead as a permanent home; that he never intended to leave it; that he expected to remain and die in that home and county, it certainly would not be contended that such statements were admissible.

In *Siebert v. People*, 32 N. E. 431, deceased had

died from poisoning. The defendants offered to prove that the deceased at different times within a year of his death, and prior to his last sickness, which resulted in his death, made threats that he intended to commit suicide. The court held, after reviewing numerous authorities, that the offered evidence was not admissible, saying: "The offered evidence was no part·of the *res gestae*. It was not a dying declaration, it accompanied no act, it characterized no transaction, and we are aware of no principle upon which it was admissible."

In *State v. Vincent,* 24 Iowa 570, it was held, in a prosecution for murder, in which one theory of the defense was, that the body found was not that of the person with the murder of whom the prisoner stood charged, that evidence that such person, before he left home, informed the witness that he intended soon to leave, and never make himself known to, or be heard from by, his family, was inadmissible.

(d) George H. King, a handwriting expert of some twenty years' experience, testified in effect that the XXs attached to the power of attorney, bill of sale and receipt hereinbefore referred to, witnessed by plaintiffs in error, were in his opinion not made by. McDowell. He reached this conclusion by comparing certain + +s, admittedly made by McDowell on some checks, with the XXs appearing upon the power of attorney, bill of sale and receipt.

While admitting that said King was an expert on handwriting, plaintiffs in error contend that XXs and + +s are not the subject of expert testimony and that the witness did not, nor could any person, qualify as an expert thereon.

While the rule established by the weight of authority is that the decision of the trial court as to the qualification of an expert is never reversed, except in cases of abuse, it is clearly apparent that if

signature XXs and + +s be not the subject of expert testimony, permitting such relative thereto is manifestly an abuse which would necessitate a reversal. It, therefore, becomes imperative that we determine the question presented.

We are clearly of the opinion that upon reason and authority the XXs and + +s under consideration were proper subjects for expert testimony, and that the witness qualified within the requirements of the law.

An expert is one who has superior knowledge of a subject and is, therefore, able to afford the tribunal having the matter under consideration a special assistance, and his knowledge may have been acquired by professional, scientific or technical training or by practical experience in some field of human activity, conferring on him an especial knowledge not shared by men in general.—*Bradford v. People*, 22 Colo. 157; 17 Cyc., p. 36.

It was shown that witness had a large experience in examining handwritings, and signatures and signature marks, in the course of his business in one of the largest banks in the city of Denver; that he had read and studied all books accessible on handwriting and expert testimony pertaining thereto; that his position in the bank for a number of years had been such as to make him a skilled observer in such lines. Besides, it was admitted that he was qualified as an expert on handwriting. Therefore, he certainly was qualified as an expert on XXs and + +s forming a signature, for the latter is embodied in the former and constitutes a part thereof.

Sec. 4185, par. 11, Mills' Ann. Stats., expressly declares: "That in all cases when the written signature of any person is required by law, it shall always mean the proper handwriting of such person, or in case he is unable to write his proper mark."

Under this statute and § 1746c, Mills' Ann. Stats., it appears that signature marks are clearly the subject of expert testimony.  But irrespective of the statute, a signing by mark is a "written signature," and, as will hereinafter appear, is the subject of expert testimony.

Lawson on Expert and Opinion Evidence,' p. 296, states the rule as follows:

"Hand-writing  *  *  *  includes a mark made by a person unable to write, and all writing done by a person able to write, whether his usual hand or signature or not."

And among the illustrations given in support of the proposition is the following:

"A. M. is sued on a bill of exchange, which she had indorsed with her mark; the writing 'A. M., her mark' being in the plaintiff's hand-writing, W. testifies that he has frequently seen A. M. make her mark, points out some peculiarity in it, and expresses the opinion that the mark on the bill is hers.  His opinion is admissible."

The author supports his illustration by the citation of authority.

Several cases are cited by plaintiffs in error to sustain their contention that + +s are not the subject of expert testimony, yet they rely principally upon the case, *In re Hopkins' Will,* 172 N. Y. 360, 365.  The facts in that case were, a paper writing in the hand of another, purporting to be the will of Robert E. Hopkins, with the signature in his own hand attached thereto, but canceled by fourteen nearly perpendicular marks with pen and ink drawn across the letters of his signature, was under consideration.  The presumption that the will had been thus revoked by the testator was sought to be overcome by showing that the fourteen marks across the signature were not made by Hopkins, but by the

hand of some other person. The court in holding that expert testimony relative thereto was inadmissible said:

"Were these marks 'writings' within the meaning of Chapter 36 of the Laws of 1880, and Chapter 555 of the Laws of 1888, which permit the comparison of writings by experts? The Appellate Division appears to be of the opinion that they were. But we do not understand that such was the purpose or intent of these statutes. * * * The statutes do not purport nor were they intended, to change the meaning of the word 'writing' as it had theretofore been used or understood, or to authorize comparison with anything that was not previously regarded to be the subject of comparison."

In the opinion various authorities are cited and reviewed, and it is said:

"An expert may doubtless be able to determine whether one mark is made over another, whether a mark is made by a trembling or steady hand, and, if familiar with inks, he may also be able to determine nearly the age or the time that the writing was made. It has also been held that the mark of an individual to an instrument may be proved by those who have seen him make his mark to other instruments where the mark contains some peculiarity which they have noticed and observed, thus enabling them to distinguish it from other marks.—(*Strong v. Brewer*, 17 Ala. 706; *Paisley v. Snipes*, 2 Brev. (S. C.) 200; *George v. Surrey*, 1 Moody & Malkin (Eng.) 516). But this class of evidence is dependent upon the familiarity of the witnesses with the peculiarities of the person making the cross, and is not the subject of the opinion of experts whose only knowledge or familiarity of writings is obtained by comparison."

It will be observed that while the court concedes that the signature mark of an individual may be

proved by those who have seen him make his mark to other instruments, yet it is said this class of evidence is dependent upon the familiarity of the witness with the peculiarities of the person making the cross, and is not the subject of the opinion of experts whose only knowledge or familiarity of writings is obtained by comparison. As will be seen from a careful reading of that case, the discussion of the admissibility of expert testimony as to signatures was wholly unnecessary, the matter not being involved in the case. A material distinction exists between marks at most only occasionally made, and those employed continually for a particular purpose. Nor do we consider the reason assigned as the basis for the admission of evidence of signature marks, logically sound. It is obvious that if a person sees another make his mark, and the mark contains some peculiarity which such person observes, thus enabling him to distinguish it from other marks, when he testifies to such mark, he does so, by comparison of the actual mark before him with the mental picture retained. Whether the mark is proved by one who has seen the particular individual make his mark on other instruments, and then from a memory impression thus acquired and possessed, compares it with the instrument in question, or by one skilled in judging peculiarities, from a comparison of the questioned marks with the admittedly authentic marks, the kind of proof is exactly the same. In either case the testimony is from knowledge acquired, and is by comparison. Our own opinion is that the one schooled in sagacious observation is better able to speak accurately from the knowledge acquired by an actual study and comparison of the authentic and disputed instruments before him, than one unskilled speaking from knowledge acquired by means of an uncertain mental picture. If the one who has seen

him write is able to judge of the peculiarities of the mark, and, from memory, state the truth, certainly one skilled in discovering peculiarities, and distinguishing features, is competent to state whether such peculiarities discovered by him in admittedly authentic samples, are present or lacking in those in dispute.

In *Morrison v. Porter,* 35 Minn. 426, 29 N. W. 54, it is said:

"In such cases (of acquaintance by seeing the person write or by correspondence) the conception of the hand-writing retained in the mind of the witness becomes a standard for comparison, by reference to which his opinion is formed, and given in evidence. It would seem that a standard generally not less satisfactory, and very often much more satisfactory, is afforded by the opportunity for examining, side by side, the writing in dispute and other writings of unquestioned authenticity."

We are not unaware that in the early efforts to introduce the last named character of evidence, a distinction was recognized between that species of evidence designated "comparison of hands," and the evidence from those who had seen the person write, and that in some courts, as hereinbefore appears, the alleged difference is still pointed out.

As a matter of fact, at certain stages of our law all the ways of proving handwriting by its type, while not entirely repudiated, were greatly discountenanced and strictly limited in their use. For a long time the only accepted mode of such proof was by those who had seen the person write. Then the doctrine was announced, reluctantly accepted, but finally firmly fixed, that a witness was proper who had knowledge based on specimens of writing, seen by him, and somehow known to him as genuine, otherwise than by seeing them written. This was fol-

lowed by the rule permitting such persons to examine disputed writing and bring into court the specimens they knew had been written, comparing them, and stating their conclusions as to their similarity or dissimilarity.  At that time all other modes of testimony, relative to the comparison of hand-writing, was excluded.  It excluded the testimony of experts speaking from comparison, but eventually, science and art, and the advancement of knowledge, forced the rule that a witness skilled in writing may give his opinion hypothetically, on specimens shown, and their genuineness having been admitted or otherwise proved.—Ch. 68, Wigmore on Evidence.

An examination of many cases cited or referred to in support of the contention that XXs and + +s as signature marks are not the subject of expert proof, discloses that no attempt was made in such cases to prove the signature mark.  On the other hand the question under consideration in such cases was the propriety of allowing the handwriting of the maker of an instrument to be proven, instead of proving the signature of the witness to the execution of the instrument, the latter having signed by mark.

In *George v. Surrey,* 1 Moody & Malkin, p. 516, M. executed an instrument by mark and the words "Ann Moore, her mark," being in the plaintiff's hand, a witness was called to prove the signing, who stated he had frequently seen Ann Moore make her mark, and so sign instruments, and he pointed out some peculiarity.  Tindall, C. J., held the evidence proper and sufficient.

In the case of *Little v. Rogers,* 99 Ga. 95, it is said:

"Promissory notes found among the papers of an illiterate deceased person, purporting to have been signed by him with his mark and which he had paid, are, on the trial of an action against his administrator

(13)

upon another promissory note also purporting to have been signed by the intestate with his mark, admissible in evidence for the purpose of comparing the marks on these notes with that affixed to the note in suit, the defense to the action being that this latter note was a forgery.''

In *Strong v. Brewer,* 17 Ala. 706, 710, an instrument was in question signed by Elizabeth Brewer, who could write, and purporting to be signed by Isaac Brewer, her husband, by making his mark in the shape of a cross, his name being written at length by some other person. The son of the Brewers was introduced as a witness and testified to the handwriting of his mother, and stated that he knew the mark of his father, and that the mark attached to the foot of the instrument he believed to be his father's mark. This mode of proving the instrument was objected to on the ground that a mark, differing from an ordinary signature, could not be proved in the manner proposed. The objection was overruled and the appellate court in maintaining the ruling expressed itself as follows:

''The general rule, which admits of proof of the hand-writing of a party, is founded on the reason, that in every person's manner of writing there is a peculiar prevailing character, which distinguishes it from the hand-writing of every other person, and therefore, that one, who knows the hand-writing of the party, is competent to testify to it. This kind of evidence too, like all other probable evidence, admits of every degree, from the lowest presumption to the highest moral certainty.—1 Phil. Ev., 484. The degree of weight to be attached to it depends not only upon the character of the witness, but also upon the opportunity he has had of acquiring a knowledge of the party's hand-writing. It may be more difficult to acquire a knowledge of a simple mark, by which

an illiterate man executes a deed, than the knowledge of the hand-writing of one, who can write his name in full, but we cannot perceive why it may not be done. In some instances, the peculiarity may be as strong as that which marks the characters of one who can write, and in other instances, not perhaps so great; yet in all, we apprehend, would be found something distinct and peculiar, which would enable one, who had frequently seen the party make his mark, to know it. We can, therefore, see no reason why one, who has frequently seen a party make his mark to deeds or other writings, and who can testify that he believes that he knows it, may not be permitted to prove the execution of a deed thus subscribed. We are somewhat surprised that we can find but one case in which this question arose, and that is the case of *George v. Surry,* 1 Mood. and Malk. 516, referred to in Cowen and Hill's notes to Phil. Ev., vol. 3, 1323, in which it was held, that a witness who had seen the party, whose signature he was called to prove, make her mark, might be permitted to testify to the execution of the instrument. We do not think the court erred in admitting this evidence. It could not be rejected as illegal, but its weight was for the jury.''

In *Shinkle v. Crock,* 17 Pa. St. 159, 162, cited in support of the contention that signature marks cannot be the subject of expert evidence, it is nevertheless said:

''Where a mark, on inspection, appears to have nothing in its construction to distinguish it from the ordinary marks used by illiterate persons to authenticate their contracts, it is not the subject of this description of evidence.''

In *State v. Byrd,* 93 N. C. 624, 626, it is said:

''While generally a mere cross mark employed by a person, who cannot write, as evidence that he

executed a paper writing to which it is affixed, cannot be proven, yet a person may have a mark so peculiar and so uniformly used by him for such purpose, as that it may become well-known as his mark, and may be proven just as the signature of one who writes may be proven to be his own hand-writing.''

And in *Travers v. Snyder*, 38 Ill. App. 379, which evidently forms the basis for the language *In re Hopkins' Will, supra,* it is said:

''It seems to us that it would be very unsafe, and lead to dangerous results, to allow such comparisons, (by experts of signature marks) to be made and taken as evidence, unless at least some proof were made that the defendant's mark had some established characteristics, like a hand-writing, that would enable it to be recognized.''

We consider the true rule is announced in *State v. Tice,* 48 Pac. (Ore.) 367, 369, where, after reviewing many authorities, it is said:

''Considering the manner in which marks of persons incapable of writing their own signatures are usually made, by merely touching the pen while the scrivener forms the character, it is a matter of doubtful propriety whether any person ought to be allowed, as a matter of evidence, to identify such a mark as a hand-writing; but the mark of some persons, by reason of methods of their own adoption in its formation, and its inherent peculiarities, might be capable of identification, and we are of the opinion that such evidence ought to be permitted to go to the jury; but the attending circumstances touching the habits of the person whose mark is in the balance, his accustomed manner of making the same, and the peculiarities attending it which render it capable of identification, should be carefully considered and scrutinized in determining the weight to be ascribed thereto.''

In the case at bar the deceased's mark has many peculiarities and was apparently so uniformly used by him for such purposes as to make it well-known as his mark. It is clearly evident, from the enlarged photographs and the samples in evidence, that his conception of a cross was the Greek Crucifix, and such cross was his adopted signature. This evidence was properly admitted. The weight to be attached to it was for the jury under proper instructions of the court.

4. It is argued that the court erred in not setting aside the verdict of the jury by reason of the pre-judging of the case by a juror—Hugh Stoops. Affidavits and oral evidence of the juror and others were taken by the court on the subject, and the matter at issue in that respect, was fully passed upon by the trial court. Under the doctrine announced in *Smith et al. v. People,* 39 Colo. 202, 207, 88 Pac. 1072, the matter is not debatable here. Besides, we have examined the record here and there is not sufficient evidence to justify a conclusion different from that reached by the trial court.

5. Instruction No. 21 is as follows:

"You are further instructed that while in all criminal cases wherein a conspiracy has been shown beyond a reasonable doubt to exist, any act, statement or declaration by one of the conspirators, done or made in furtherance of the objects of the conspiracy during the existence of the conspiracy, is admissible not only against the one making such statement, but against his co-conspirator, yet this rule is limited to such act or statement as was done or made prior to the time when the conspiracy came to an end, and that when the conspiracy is at an end, whether by accomplishment or abandonment, such acts or statements of one conspirator shall be taken and considered only as against the one making them;

*but such acts or statements when so proven and so admissible, if made against interest, are presumed in law to be true by reason thereof."*

It is contended that the portion of the instruction appearing in italics is radically wrong, and embodying it in the court's charge to the jury, constitutes reversible error. Counsel argue that by this portion of the charge, the jury was precluded from passing upon the truth or falsity of an alleged admission of defendant Moon, received in evidence; and that the words used was a prejudicial comment, by the court, upon the weight of the evidence. It is argued that prior decisions of this court sharply discriminate between presumptions of law and presumptions of fact; that whenever a "presumption of fact" is given by the court as a "presumption of law," it is such error as will necessitate a reversal; and that the presumption of the truth of an admission against interest is a "presumption of fact," and not of law. There can be no doubt that some decisions of this court, namely, *Fincher v. People,* 26 Colo. 169, 170; *Van Straaten v. People, idem.,* 184; *Nilan v. People,* 27 Colo. 207, 212, and perhaps others, have recognized a distinction between the so-called "presumptions of fact" and "presumptions of law," and condemned the use of the latter and approved the former when applied to disputable facts. While conceding that the above appears to be the doctrine announced by this court, the writer of this opinion entertains a different view of the meaning of the words "presumption of law," and would be willing to overrule such decisions, in that respect, and approve the instruction here in question. Other members of this court are, however, averse to modifying the rule announced in those cases, but prefer to sustain the instruction upon other grounds hereinafter stated, which also appear, to my mind, sufficient for that

purpose. I deem it proper, however, before stating
those reasons to briefly state my views relative to the
phrases "presumption of fact" and "presumption of
law." It appears to me that the attempted distinc-
tion between a "presumption of law" and the so-
called "presumption of fact" is often so metaphysi-
cal, subtle and shadowy as to elude analysis. The
adjudications upon the subject are numerous and
discordant. As declared in Best on Evidence, §§ 313,
327: "We find the same presumption spoken of by
judges sometimes as presumption of law, sometimes
as a presumption of fact, sometimes as a presumption
which juries should be advised to make, and some-
times as one which it was obligatory on them to
make." It is, therefore, not remarkable, nor is it
the subject of just criticism, that in the use of the
puzzling and uninstructive term, "presumption of
fact" and in the attempted classification of presump-
tions, this court in common with other courts, has
made an apparent distinction when in reality none
existed. I am convinced that logically there is no
such thing as a "presumption of fact." A specific
inference is repeatedly drawn from a recurring state
of facts, and from such inferences so drawn, a rule
called a presumption may be established. Or it may
be the rules are based on general experience, or prob-
ability of any kind; or merely on policy and con-
venience. Presumptions, in judicial procedure, are
rules which assume the truth of certain matters for
the purpose of some given inquiry. Upon whatever
basis they rest they operate in advance of evidence
or argument, or, irrespective of each, by taking the
same for granted; by assuming its existence.

Prof. Thayer in his Prel. Treat. on Evi. at the
Common Law, p. 339, declares that: "All presump-
tions, other than the mere nontechnical recognition,
by courts, of ordinary processes of reasoning, are the

subject of rules of presumptions; and these rules, of whatever varying degrees of stringency and exactness of application  *  *  *  all  *  *  *  belong to the law and are rules of law.'' Hence they must be ''presumptions of law.''

And Prof. Wigmore in his work on Evidence, § 2491, asserts that: ''The distinction between presumptions 'of law' and presumptions 'of fact,' is, in truth, the difference between things that are in reality presumptions  *  *  *  and things that are not presumptions at all. A presumption  *  *  *  is in its characteristic feature a rule of law.  *  *  *  The distinction between presumptions of fact and of law was a mere borrowing of misapplied Continental terms. There is in truth but one kind of presumption; and the term 'presumption of fact' should be discarded as useless and confusing.''

The so-called presumption ''of fact'' is always an act of reasoning, a deduction made, whereas a real presumption—that is, a presumption ''of law'' —is simply a rule applied. In presumptions there is no inference, but the presumption is the result usually of previous inferences ascertained from like facts. The rule assumed applies or attaches to certain circumstances when proved, and is in no wise deduced from them. The rule of law which is the presumption, may be, and usually is, the result of recurring deductions from the same class of facts. ''Many facts and groups of facts often recur, and when a body of men with a continuous tradition has carried on for some length of time this process of reasoning upon facts that often repeat themselves, they cut short the process and lay down a rule. To such facts they affix, by a general declaration, the character and operation which common experience has assigned to them.''—Thayer's Prel. Treat. on Evi., p. 326.

Thus the recurring facts, that each individual possesses the ordinary human faculties; that individuals are sane; that men are innocent of willful violations of the law; that one intends the natural and probable consequence of his own acts; that a child born in wedlock is legitimate; that an admission against interest is true, resulted, for the convenience of man, in presumptions establishing, *prima facie,* the affirmative of such facts without proof, and constitute a rule of law in the particular case applied, and in no sense a presumption of fact therein. The fact, or the deduction from the facts in evidence, in the particular inquiry may be otherwise than the presumption. To say that a certain thing is "a presumption of fact" is to attempt to mandamus the human mind. One mind may infer from certain facts a different result than that deduced from the same facts by another mind. For a court to advise a jury that a certain thing is a presumption "of fact," and not "of law," and that they are at liberty to presume certain things from facts in evidence, is more nearly a comment upon the weight of evidence, than to advise that "the law presumes" certain things when certain facts are proven. Under the last example the rules of law applied, have only assumed, or brought before the jury, the evidence of an ultimate fact, but left to the jury the duty of drawing conclusions of fact from the evidence so before them. Whereas in the former example the court suggests, intimates and points out to the jury what inferences may be drawn.

Segregated from the other parts of the court's charge to the jury, we all concur in the conclusion, that under the doctrine announced in the previous decisions of this court heretofore referred to, the instruction would be erroneous for the reasons which counsel advance; but the majority of the court does

not consider it—when read with the entire charge—
subject to that objection. It is to be observed, that
the instruction in which the objectionable words are
used, is an abstract statement of the law on the sub-
ject of the admissibility in evidence of the acts and
declarations by one of two or more conspirators;
when they are to be taken as against one, and when
against all. No attempt therein is made by the court
to apply the law to the facts of the case in hand.
But in a subsequent instruction—No. 27—the law
concerning the acts and statements of a conspirator,
and their effect, which were abstractly given in No.
21, was correctly applied to the facts in this case.
We, therefore, have in No. 21 an abstract statement
of the law, and in No. 27 its concrete application. If,
as we have said, the instruction stood alone, it would
be objectionable as an invasion of the province of the
jury, but when the court came to apply the law to
the facts of the case, it correctly told the jury, in
effect, that the statement of the defendant Moon, an
alleged conspirator, to which statement counsel for
defendants say the law was to be applied, is not a
subject for their consideration at all, unless corrobo-
rated by other evidence. In No. 27 the jury are
specifically told, that even though they might believe,
beyond a reasonable doubt, that defendant Moon
made the statement testified to, they were to acquit
him, unless there was corroborative evidence of said
admission. This was immediately followed in in-
struction No. 28, by explicit language in the usual
words, that the jury are the sole judges of the credi-
bility of witnesses, and the weight of all evidence
"and the facts established by the evidence." It is,
therefore, clear that no prejudice to defendants, or
either of them, resulted in giving instruction No. 21.
—*Covington v. People*, 36 Colo. 183, and *Keady v.
People*, 32 Colo. 57, support this conclusion. In the

latter case defendant Keady was convicted of an assault with intent to murder.   He complained of three instructions on malice, because, as he stated, the jury was told thereby that the law implied malice from certain acts and conduct, whereas malice is always for the jury.   Those instructions were merely abstract propositions of law, and were, in the particular noted, as objectionable as instruction No. 21 here, and yet this court held that in other instructions, in which the court applied the law to the facts of the case, the court thereby limited the alleged implication that the jury should, as a matter of law, imply malice, by directions, that they were the sole judges whether, as a matter of fact, malice was proved.

Certainly the truth or falsity of the admission, and the weight which should be given to it, are all questions peculiarly within the province of the jury to determine, and were so left by the instruction in question, and the entire charge given to the jury. Whether any admissions at all were made or proven is left to the jury.   Whether such statements, if made, were against interest, is likewise left to their determination.   No intimation is made as to the weight to be given such admissions.   The jury are simply told that if any admissions against interest were proven to have been made, then they "are presumed in law" to be true; but the credibility of the witnesses so testifying, or whether such admissions were really made, or whether they were against interest, and the weight to be given them, was by other proper instructions left to the determination of the jury.   If contrary evidence adduced, or the circumstances of the case, showed, the nontruth of such admissions, the presumption would necessarily disappear, for the court, in instruction No. 28, expressly told the jury that they were the "sole judges of the

credibility of the witnesses, and the weight of the evidence and the *facts* established by the evidence.''

We have carefully considered the record, the assignments of error based thereon, and the arguments of counsel in support of their respective positions, and are fully persuaded that the facts and circumstances of the case were, and are, sufficient to remove every rational doubt, and convince the mind that plaintiffs in error are guilty of the offense as charged. It may be barely possible that the crime alleged was never committed, but until the faculties of man are unfolded and expanded so that all things are known, we must act on circumstances as they appear, logical deductions made and presumptive proof, or leave the worst crimes unpunished. The entire record satisfies our minds that the plaintiffs in error have had a fair trial under the law, fully and fairly applied to the facts of the case, and have not been prejudiced in any substantial rights, and that the judgment of conviction herein ought to be, and is, accordingly affirmed. .                         *Judgment affirmed.*

Decision *en banc.* Former opinion withdrawn, rehearing denied.

Mr. JUSTICE CAMPBELL specially concurring.

Mr. JUSTICE GABBERT and Mr. JUSTICE BAILEY dissenting.

Mr. JUSTICE HILL not participating.

---

Mr. JUSTICE CAMPBELL specially concurring:

I concur in the affirmance of the judgment. If it can be justly said that the answer which Mr. Justice White in his opinion makes to the objections interposed to instruction No. 21 is not based on tenable grounds—as to which no opinion is here expressed

—yet, if it be illogical, the same result, that prejudice to defendants did not result, may be reached by another line of reasoning which commends itself to my judgment. If under the doctrine announced by this court in *Fincher v. People,* 26 Colo. 169; *Van Straaten v. People,* same 184; and *Nilan v. People,* 27 Colo. 206, the instruction considered as a whole is to be taken as a comment upon the evidence, or was calculated to induce the jury to believe that the court meant them to understand that such acts and state- ments should be regarded by them as true, or, as matter of law, that they should have weight with the jury in their deliberations without reference to what the jury, as matter of fact, thought about them, then it is probably true, and I am inclined to that view, that harm was done to the defendants. But if the instruction was not intended by the court as a com- ment upon the evidence and was not so understood by the jurors, defendants cannot complain of it. Let us analyze this instruction: In it the court was con- sidering the general subject of conspiracy. The gen- eral rule is that acts and statements of one party are not competent evidence against a co-party, except in cases of identity of interest, as by agency, conspiracy or common design. There was evidence in this case tending to prove a conspiracy of defendants with other parties, and of acts and statements of one of them, against interest, in furtherance of the con- spiracy. The trial court in this instruction was merely declaring in abstract terms the law concern- ing the admissibility of the declarations and conduct of one conspirator, pointing out when it is to be taken against the one and when against all. The court, then, though there may have been no necessity there- for, stated to the jury the rule of law by which it was governed in admitting evidence of this character,

and said, in effect, that this rule required its reception because of the presumption of its truth. This language, however, in the connection in which it is employed, and upon the subject to which the court was speaking, is not equivalent to a comment on the weight which the jury is to give to the conspirators' acts and statements after they are admitted in evidence, by the court. Probability is lent to this conclusion, that the court was speaking only of the admissibility, and not the weight, of this evidence, and that the jury so understood, by the fact that in instruction No. 27 the court proceeded to apply the law on this subject to the facts of the case in such a way as clearly to indicate to the jury that they must find the facts for themselves and give them the weight they thought they ought to have. Elsewhere in the charge and in instruction No. 28, by appropriate instructions, the jury were told that they were the "sole judges of the credibility of the witnesses and of the weight of the evidence and the facts established by the evidence," which, of course, includes statements and admissions of the alleged conspiracy. The most that can be said in behalf of plaintiffs in error is that the court might well have expressly added the caution to the jury that the presumption referred to in the instruction was one by which the court was governed in the admissibility of evidence. Of this non-direction, however, defendants may not complain in the absence of a request therefor. To sum up, the court did not comment upon the weight of evidence. The legal presumption mentioned was one which the jury must have understood, for the reasons already given, as applicable only to the function of the court in its ruling upon the competency and admissibility of evidence and not to that of the jury in passing on its weight and sufficiency.

*On Petition for Rehearing.*

Mr. Justice GABBERT dissenting:

When the original opinion was handed down I concurred in the conclusion there reached, that instruction No. 21 was not erroneous; but upon further consideration I am convinced that it is; that it is not supported by authority, and, in fact, when carefully considered, cannot be the law.

It is the province of the court, in the first instance, to determine whether or not the foundation has been laid which renders testimony of the character mentioned in the instruction competent. If the trial judge determines that the proper foundation has been laid, the testimony is admitted, upon the theory that a rational person will not perform acts or make statements tending to prove that he is guilty of the offense for which he is on trial, unless such acts were committed in furtherance of a common design, or the statements attributed to him were true. But this estimate of the truth of such testimony extends no further than to render it admissible. Beyond this it is not aided by any presumption of the truth. In the very nature of things, the rule cannot be otherwise. Acts and statements may be proved which tend to establish the guilt of the accused, and yet, when considered in connection with other circumstances in evidence, are so inconsistent or improbable that their probative force is entitled to little or no weight.

In the case at bar the trial court, after advising the jury under what circumstances the acts and statements of the accused as co-conspirators were admissible as against each other, says—"but such acts or statements, when so proven and so admissible, if made against interest, are presumed in law to be true by reason thereof," when, under the law, the acts

and declarations referred to were merely evidence which it was the exclusive province of the jury to weigh and estimate, and in connection with all the testimony, determine what degree of weight and credit should be accorded them.—1 Greenl. Ev., § 215; *State v. Gleim*, 17 Mont. 17; 6 Enc. of Law 580; *Morrison v. State*, 41 Tex. App. 516; *Harris v. State*, 1 Tex. App. 74; 1 Elliott Ev., § 246; *Pharr v. State*, 7 Tex. App. 472; *Thompson v. State*, 19 So. 204; *State v. Sullivan*, 22 Pac. 1088; 2 Thomp. Tr., § 2287; *Clay v. State*, 86. Pac. 17; *State v. Willing*, 105 N. W. 355. Or, in other words, the jury must be left to exercise the same degree of freedom with reference to acts and declarations of co-conspirators which is their prerogative with respect to other testimony. They are not required to attach any weight or credit to testimony of that character merely because it has been admitted by the court, but must determine for themselves its credibility and weight in connection with all the circumstances and other testimony in the case.—*Commonwealth v. Knapp*, 10 Pick. 477; *Brister v. State*, 26 Ala. 107; *Ellis v. State*, 65 Miss. 44; *State v. Smith*, 9 Houston (Del.) 588.

The instruction clearly violates this uniformly established rule. Its effect was to send to the jury the incriminating acts and statements so far as proven clothed with the erroneous presumption that they were to be regarded as true, when, in law, the presumption which attached to this evidence went no further than to render it competent and admissible.

Error is deemed prejudicial unless it affirmatively appears that it was not. Instruction No. 27 does not cure the error committed in giving the portion of No. 21 above quoted. It advised the jury in what circumstances they may consider the testimony relating to the acts and admissions of the de-

fendants, as against each other, but it does not tell them, even inferentially, that it is for them to determine what credibility and weight shall be given it. By instruction No. 28 the jury are advised that they are the judges of the credibility of the witnesses and the weight of the evidence, but this does not withdraw from their consideration the previous erroneous statement, that the acts and statements made against interest are presumed in law to be true. If, however, instructions 27 and 28 could be given the construction from which it was made to appear that the jury were thereby advised that they were the judges of the weight to be given the acts and admissions of the defendants against interest, which were proven, the error in No. 21 would not be cured. We cannot tell which instruction the jury followed. A charge containing two conflicting propositions of law upon a material point, one correct and the other incorrect, must be held erroneous, it being impossible to determine upon which proposition the jury relied.—*Clare v. The People,* 9 Colo. 122.

A rehearing should be granted, and upon further consideration, unless it appears that the error in No. 21 was not prejudicial, the judgment of conviction should be reversed and a new trial granted.

Mr. JUSTICE BAILEY concurs in this opinion.