[No. 4974.]

## COVINGTON V. THE PEOPLE.

1. **Practice in Criminal Cases—Information—Grammatical Error.**

Grammatical errors should be disregarded if the real intention and meaning of the information is not obscured thereby.
—P. 185.

2. **Information—Grammatical Error—Motion in Arrest.**

A motion charging that accused "did then and there in and upon the body of one Winnie Adams, feloniously, unlawfully, wilfully, and of his malice aforethought, commit an assault, and she, the said Winnie Adams, then and there feloniously, unlawfully, wilfully, and of his malice aforethought, did kill and murder," though subject to criticism because of the wrongful use of the pronoun she, which at most amounts only to a grammatical error, under Mills' Ann. Stats., §1433, providing that no motion in arrest of judgment shall be sustained for any matter not affecting the merits of the offense charged, is sufficient as against a motion in arrest of judgment.—P. 186.

3. **Practice in Criminal Cases—Homicide—Circumstantial Evidence—Instructions.**

Where the evidence in a trial for homicide showed that a witness and the defendant were standing just outside of a house talking, and the defendant had his hand on his pistol when the deceased stepped out and called witness, who walked towards her four or five steps, at which time a shot was fired, killing deceased and striking witness on the finger, and almost at the same time witness saw defendant holding a pistol aimed in that direction; held, that while the witness was not looking at defendant at the instant the latter fired his pistol, yet the interval was so short between the time that witness saw defendant with his hand upon the pistol and the time he heard the report and felt the effect of the bullet on his finger and saw the position in which defendant held the pistol immediately upon the shot being fired, that such evidence is not circumstantial within the meaning of 3 Mills' (Rev.) §1776, providing that no person shall suffer the death penalty who shall be convicted on circumstantial evidence alone, and therefore the court properly charged the jury that the death penalty might be inflicted.—P. 190.

4. **Same—Murder in Second Degree—Instructions.**

An instruction, on a trial for homicide, stating that the jury might presume that accused intended the usual and ordinary consequences as the result of his act, and if they found from the

evidence that accused intentionally fired a loaded pistol at de-
ceased, and that the bullet struck her and inflicted on her a
mortal wound, they were at liberty to imply that accused feloni-
ously, and of his malice aforethought, *killed and murdered de-
ceased*; and authorizing in case of such finding, a verdict of
murder in the second degree, was not erroneous, for it left to the
jury to determine from the evidence whether defendant inten-
tionally fired the fatal shot.—P. 191.

**5.   Same—Instructions—Refusal to Give.**

It is not error to refuse requested instructions, although
correct, when embodied in substance in other instructions given.
—P. 193.

**6.   Same—Instructions not Based on Evidence.**

Where on a trial for homicide there was no evidence that
the killing was the result of accident or carelessness in the
handling of a pistol by defendant, and, in addition, defendant
denied all knowledge of the shooting, instructions tendered,
directing the jury to acquit if the killing was accidental, were
properly refused.—P. 194.

**7.   Same—Argument of Counsel—Comment on Evidence.**

Where in a trial for homicide the evidence showed that
sometime previous to the shooting of deceased, defendant had
voluntarily engaged in another shooting affray; that he owned
and carried a gun in a peaceable community without any legiti-
mate excuse; that on the night of the killing he had drawn a
gun on a third person, and later, in order to enforce a demand,
had fired into the air; that on the same night he was seen out-
side of his own house with a gun in his hand, while carrying a
bucket of coal, was sufficient to justify the district attorney in
stating, in his argument to the jury, that "Defendant may have
had a good reputation, but he has gone wrong. He has gone out
there and established a reputation for being a gun man."—P. 194.

*Error to the District Court of El Paso County.*
*Hon. Robert E. Lewis, Judge.*

Henry Covington was convicted of murder in
the second degree, and brings error.    *Affirmed.*

Mr. T. J. BLACK, for plaintiff in error.

Mr. N. C. MILLER, attorney general, and Mr.
I. B. MELVILLE, assistant attorney general, for de-
fendant in error.

Mr. Justice Goddard delivered the opinion of the court:

The plaintiff in error, defendant below, was convicted of the crime ˙of murder in the second degree and sentenced to the state penitentiary for a term of from ten to twelve years at hard labor. Upon the overruling of a motion for a new trial, counsel for defendant interposed a motion in arrest of judgment, for the reason that the information does not state facts sufficient to constitute murder in either degree. The information charges that "Henry Covington, on the 4th day of January, A. D. 1905, at the said county of El Paso, did then and there in and upon the body of one Winnie Adams feloniously, unlawfully, willfully and of his malice aforethought commit an assault and she, the said Winnie Adams, then and there feloniously, unlawfully, willfully and of his malice aforethought did kill and murder."

It is contended that by using the pronoun "she" the pleader charges the deceased with the commission of murder, and that the defendant is simply charged with an assault. While the information is subject to criticism because of the wrongful use of the pronoun, it at most amounts to only a grammatical error, and there is no doubt that, when taken in connection with the other averments, the information charges that the defendant killed Winnie Adams. It is well settled that grammatical errors should be disregarded if the real intention and meaning of the information is not obscured thereby. In *Dickson v. The State,* 62 Ga. 589, the court, in considering an indictment where the gender and number of two persons were involved, thus disposed of a like objection:

"This is an unsightly literary blemish, but not a grave legal infirmity. In school the composition would not pass, but it may be tolerated in the courthouse. The meaning is clear, though the verbal in-

accuracy is glaring. We may regret that those who write affidavits and warrants guard their pronouns with so little vigilance, but we cannot hold, as matter of law, that their bad grammar vitiates the documents.''

Section 1433, Mills' Ann. Stats., provides that: ''No motion in arrest of judgment or writ of error shall be sustained for any matter not affecting the real merits of the offense charged.'' The use of the wrong pronoun did not affect the real merits of the offense charged. The defendant was in no way misled or prejudiced by the use thereof. The court did not err in overruling the motion.

It appears from the undisputed testimony that, while somewhat under the influence of liquor, the defendant, on the evening of the 4th of January, 1905, visited the house of Winnie Adams, the deceased, where were present Samuel Terry, Fred Hopkins, Bailey Trimble and the deceased; that, upon his entering the house, Hopkins advanced to shake hands with the defendant, who drew a revolver and said, ''Don't come any nearer me, I will shoot you,'' whereupon Hopkins backed off, and the defendant added, ''No, I don't mean to hurt you or anybody,'' and threw his gun upon the floor, saying, ''I don't mean to hurt anybody; I want to show you that it is a safety. It is as safety a gun as a man can carry.'' Hopkins picked the gun up and placed it upon the table or dresser. After remaining there some time, the defendant said, ''I believe I will go home. Give me my gun.'' That he (Hopkins) gave the defendant the gun, and defendant started to go, and said to Terry, ''I want to see you.'' Terry went out of the house with him, and while outside talking, the deceased went out to get some coal. What occurred when she stepped out of the door is described by Terry as follows: ''Then Winnie Adams she comes

out the door; when she throws the door open, the light was right on us, you know; well, she calls me, 'Step here a minute, Sam,' and I said, 'Excuse me, Mr. Covington,' so I turns my back off and walks about four steps or five, he fired this gun just like that, bang, and she hollered and had the gun pointed just like that.''

''Q. Now, where were you and Winnie Adams?

''A. Well, I was standing, like she come out the door here, and I was standing something like this, and he was right over there, and he had the gun on me like that. She hollered, 'Oh, I am shot, I am shot,' and ran on in the house. Well, I goes on in behind her. * * *

''Q. Did the bullet hit you?

''A. Yes, it glanced my finger right there, and then he said, like this, 'Close that door.' ''

Upon cross-examination:

''Q. You say just as you turned your back to them, the shot was fired?

''A. Yes, sir.

''Q. As you turned your back to Covington?

''A. Yes, sir.

''Q. You weren't looking at him then when the shot was fired?

''A. No, sir; I didn't exactly have my back turned on him when he fired.

''Q. But you didn't see him at the time the shot was fired?

''A. No.

''Q. You heard but one shot?

''A. That is all. * * *

''Q. Where did you say the bullet struck you?

''A. I said it glanced my finger.

''Q. Just point out to the jury the fingers or the finger that it glanced.

''A. Right there (showing jury).

"Q.  The fourth finger of the right hand?

"A.  Yes, sir.

"Q.  How were you standing at the time you received the shot?

"A.  Well, I was standing just about at the side, something like this, and he was standing over there; a straight shot.

"Q.  Were you north, south, east, or west of him?

"A.  I was on the side of her here.

"Q.  You were at the side of her?

"A.  Yes, sir.

"Q.  Was she exactly north of you, or how?

"A.  She was exactly, just like me and you, sitting here this way.

"Q.  Were you facing her, or sideways, or how?

"A.  I was going up to her, and stopped sideways to her; she was bending over picking up coal.

"Q.  And you were between her and Covington?

"A.  Yes, sort of angling like, you know.

"Q.  Near what door was she standing?

"A.  She was standing near the south door.

"Q.  About how far was she from the house?

"A.  Well, she was about two feet, I guess, from the house.

"Q.  How far was Covington away when you last saw him?

"A.  Well, Covington was about six yards off from the door."

The defendant testified that he never had any difficulty or misunderstanding with Sam Terry; relations with him were friendly; never had any difficulty or misunderstanding with Fred Hopkins or with Bailey Trimble.  "Terry gave me a drink of whiskey at about 6 o'clock January 4, 1905; went to Winnie Adams' house about eight or half past eight;

drank liquor a good many times; he called it red
whiskey.''

"Q. Did you have any trouble with anybody
there?

"A. No, sir, not a word.

"Q. Do you remember of having any trouble
with him (Hopkins)?

"A. No, sir.

"Q. How long had you been there when he
(Hopkins) came?

"A. When I came over to the house, Mr. Hop-
kins and Miss Adams was standing outside the door
talking.

"Q. How long were they on the outside after
you went in?

"A. About thirty to forty-five minutes.

"Q. Did you have any trouble with Hopkins
after he came in?

"A. No.

"Q. Were you drunk or sober when Hopkins
came in?

"A. Pretty well tanked up.

"Q. Do you remember what occurred after
Hopkins came in?

"A. Yes, sir.  Hopkins came in, and Miss
Adams went right behind, and Hopkins walked up
to the stove and warmed his hands,  *  *  *  and sat
down; and after that, I don't remember anything
else that occurred in the house that night.  *  *  *

"Q. Did you intentionally fire that gun either
at Winnie Adams or Terry, or even intentionally
fire it off?

"A. I haven't fired any at all, not to my knowl-
edge.  Spent night of January 4th last at my house.

"Q. Where did you get your breakfast that
morning, January 5th?

"A. At home. After breakfast, went to work in the mines; saw Terry. I says to him, 'Good morning, Sam; I hear I shot you last night, and Miss Adams; can it be so?' He said 'Yes.' I says, 'I am awful sorry.'

"Q. When did you first learn that you were charged with the shooting?

"A. The next morning.

"Q. Who told you?

"A. Leftwich. I told him I didn't know anything about it."

We have stated the evidence thus fully, in order that the merits of the objections to the giving and refusing of certain instructions may be better understood.

Error is assigned upon the giving of the instructions Nos. 2 and 5, because therein the jury are told that the death penalty might be inflicted in contravention of section 1176, Session Laws 1901, page 153, which provides, *inter alia,* "Nor shall any person suffer the death penalty who shall be convicted upon circumstantial evidence alone." It is insisted that there is no direct evidence as to the fact of the shooting, and that Terry's statement that defendant fired the shot is but an inference based upon surrounding circumstances, and not upon actual observation, and is, therefore, to be regarded as circumstantial evidence within the meaning of the statute. While it is true that the witness testified that he turned and walked towards the deceased, he describes how the gun was fired, and how the gun was pointed. He stated that he didn't exactly have his back turned on defendant when he fired, and he then goes on to describe to the jury the position that he was in, and says: "I was standing something like this, and he was right over there, and he had the gun on me like that"; that the bullet glanced his finger. In answer

to the question, "How were you standing at the time you received the shot?" he answered, "Well, I was standing just about at the side, something like this, and he was standing over there, a straight shot"; that he was "sort of angling between the deceased and Covington." Furthermore, Hopkins testifies that when Winnie Adams came in the door, she screamed that she was shot, and, when asked who shot her, she said Henry Covington.

While it may be that Terry was not looking at Covington at the instant he fired the shot, yet the interval was so short between the time he saw him with his hand upon his gun and the time he heard the report and felt the effect of the bullet on his finger, and from the fact that he saw the position in which Covington held the gun immediately upon the shot being fired—in these circumstances, we think it can be said that the witness was cognizant through his senses of the fact that Covington fired the shot, and that his evidence as to that fact is not circumstantial within the contemplation of the statute.

Instruction No. 6, when taken as a whole, is not subject to the criticism urged against it by counsel for plaintiff in error. While the court, at the outset, stated to the jury that they might presume that the defendant intended the usual and ordinary consequences as the result of his act, yet immediately following this expression, the court used this language: "And if you find and believe from the evidence, beyond a reasonable doubt, that the defendant intentionally fired a deadly weapon, to wit, a loaded pistol, at Winnie Adams, * * * and that the bullet fired from said pistol struck Winnie Adams, inflicting on her a mortal wound, from which she died the next day, then you are at liberty to imply that the defendant did unlawfully, willfully, feloniously and of his malice aforethought kill and murder said Winnie

Adams, and, in that event, you will find him guilty of murder in the second degree.''

This instruction, as a whole, correctly states the law, and left it to the jury to determine from the evidence whether defendant intentionally fired the fatal shot. It is a well-settled rule that the trial court in its instructions should avoid indicating its opinion as to any material matter of fact, and that any violation of this rule that influences the jury to the prejudice of the defendant would constitute reversible error. And, while it must be conceded that the trial judge used an expression in instruction No. 8 that was improper, in that it assumed that defendant shot deceased, yet, when considered in connection with the context, we do not think it can reasonably be said that the jury understood this expression as intended to convey to them an opinion on the part of the court that defendant fired the shot.

That the expression was inadvertently made is evident. The court was instructing the jury as to the degree of intoxication that would relieve the defendant from the extreme penalty of the law, and would reduce the homicide from murder in the first to murder of the second degree. It was not the purpose of this instruction to call the jury's attention to the fact of the shooting, but to the condition of defendant at the time—whether he was so deeply intoxicated as to be incapable of forming in his mind a design premeditatedly and deliberately to do the act. And from other instructions theretofore given, and from what follows in this instruction, the jury were clearly advised, and understood, that it was exclusively their duty and province to find from the evidence not only the fact as to whether or not the defendant fired the shot, but as to whether he did so intentionally and of his malice aforethought, and

their verdict indicates that they discharged this duty regardless of any intimation of the court.

Counsel for plaintiff in error earnestly insist that the court erred in refusing to submit to the jury certain requests for instructions on behalf of the defendant. After careful consideration of these objections, we are of the opinion that, while some of these requests correctly announce the law, and might, with propriety, have been given, yet, in view of the evidence and the instructions given, we do not think the court committed reversible error in refusing them. In other words, the court, in its instructions, repeatedly told the jury what was essential to be proved in order to convict the defendant of murder in the second degree, which is the offense for which he was convicted. They were told that, if they found and believed from the evidence, beyond a reasonable doubt, that he had intentionally fired a loaded pistol at, and did willfully, feloniously and of his malice aforethought kill Winnie Adams, they might find him guilty of that offense. They were also told that the defendant was presumed to be innocent of any offense and that, before they could convict him, the people must overcome that presumption by proving him guilty beyond a reasonable doubt, and if they had a reasonable doubt, they must acquit him.

These instructions cover and correctly state the law applicable to the evidence in the case, and we think are equivalent to, and fully announce the law as contained in the defendant's requests numbered 5, 6, 7, 8, 9, 11, 13, 14, 18 and 22. The court, therefore, did not commit reversible error in refusing the latter. "It was competent for the court to reject all the prayers offered, and grant instructions to the jury in its own language; and, when these are correct, and cover the whole ground, the judgment will not be reversed, even though some of the rejected

prayers might properly have been granted."—*Mc-Carty v. Harris*, 49 Atl. Rep. 414. *Deitz v. Regnier*, 27 Kan. 95; *People v. Benc*, 130 Cal. 159; *City of Boulder v. Fowler*, 11 Colo. 396.

Requests Nos. 4, 19 and 20, in effect directed the jury to acquit if the killing was accidental. There was no evidence introduced that tended to show that the killing of deceased was the result of accident or of carelessness in the handling of the pistol by the defendant. He denied all knowledge of the shooting, and it is clear that no inference that the shooting was accidental or the result of carelessness is deducible from the facts as detailed by the other witnesses. In these circumstances, these instructions were properly refused.

The objection to the question propounded to the juror Perkins, we think, was properly sustained, for the reason given by the court. It could not be determined at that time what the evidence would develop, and, while the remark made by the court to the effect that counsel was "misleading the jury" was, to say the least, ill-advised, since it might have been understood by the jury as a reflection upon the good faith of counsel, and have conveyed to the jury the impression that he was not treating them fairly in his examination, yet we do not think it constitutes a sufficient reason for reversing the judgment.

In addressing the jury, the district attorney, referring to the testimony introduced by the defendant as to good character, used the following language: "The defendant may have had a good reputation, but he has gone wrong; he has gone out there and established a reputation for being a gun man." This language was objected to by counsel, and the objection was overruled. It appeared from the defendant's testimony that some time previous to the shooting in

question, he was engaged in another shooting affray, and, on cross-examination, he testified as follows:

"Q.  Did you have your gun when you went there that night?

"A.  When I started over there? Yes, sir.

"Q.  Did you have it in your hand?

"A.  Yes, sir.

"Q.  You took two shots at the fellow, didn't you?

"A.  Yes, sir."

This circumstance, taken in connection with the fact that he owned and carried a gun in a peaceable community without any legitimate excuse for so doing, and had, on the night in question, drawn it on Hopkins, and, later, in order to enforce his demand that the door to Winnie Adams' house be closed and the lights extinguished, fired into the air, and shortly after nine o'clock on the same night, was seen outside of his own house with the gun in his hand while carrying a bucket of coal—was sufficient to justify the district attorney in drawing the inference that, notwithstanding his former reputation, he had "gone wrong," and established a reputation for being a "gun man." The jury had heard this testimony, and the evidence of defendant's good character, and it was clearly within the scope of legitimate argument for the district attorney to state to them what conclusion, in his judgment, as to defendant's character for peace and quiet, was logically deducible therefrom. The remarks of the district attorney were, therefore, within the record.

After a careful consideration of the record and the able and exhaustive briefs of counsel for plaintiff in error, we are constrained to say that, while some of the objections urged might have been avoided by the exercise of more care and liberality on the part of the trial judge, yet, in view of all the testi-

mony, they occasioned no prejudice to the plaintiff in error that would justify setting aside the verdict which, in our opinion, is amply supported by the evidence.

The judgment is therefore affirmed.

*Affirmed.*

Chief Justice Gabbert and Mr. Justice Bailey concur.