## No. 13,190.

### DILL *v.* THE PEOPLE.
(29 P. [2d] 1035)

Decided November 27, 1933. Rehearing denied January 22, 1934. Motion to stay remittitur and correct mandate overruled February 26, 1934.

Mr. John R. Adams, Mr. Charles Ginsberg, for plaintiff in error.

Mr. Paul P. Prosser, Attorney General, Mr. Charles H. Queary, Assistant, for the people.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

Plaintiff in error, who is the Dill mentioned in the second paragraph of our opinion in *Crane* and *Flynn v. People,* 91 Colo. 21, 11 P. (2d) 567, is hereinafter referred to by name. He was convicted of a violation of section 6946, C. L. 1921, by obtaining money for corporate stock by a swindling or cheating transaction, and sentenced to a term of from four to ten years in the penitentiary. To review that judgment he prosecutes this writ. The cause was at issue here August 20, last.

The information herein was filed February 17, 1932, charging an offense committed April 1, 1928. On April 4, 1932, defendant filed a demurrer, a motion to quash, and a plea in bar. The demurrer raised the question of sufficient facts; the motion to quash raised the question of the constitutionality of the statute; and the plea in bar, alleging that defendant had not been a fugitive from justice, raised the question of the statute of limitations. The demurrer and motion to quash were submitted instanter and overruled and the trial then opened by agreement. After the jury was impaneled and sworn, judge, counsel and defendant repaired to chambers where a motion for a directed verdict, on the ground of no answer to the plea in bar, was presented. The district attorney called attention to the fact that the plea had just been presented and no opportunity had yet been afforded to file an answer thereto. He also contended that no such answer was necessary and that without it the question was triable under the general issue. However, he asked leave

to file. The motion for directed verdict was overruled and leave granted to answer the plea. Later, the same day, such an answer was filed, in which it was alleged that defendant had been a fugitive from justice from July 25, 1929, to October 6, 1931. Recess was taken to the morning of April 5, at which time defendant objected to any testimony in support of the answer to the plea in bar. Ruling on that objection was reserved and the trial proceeded. The evidence so objected to was therein admitted. At the close of all the evidence defendant again moved for a directed verdict and his motion was overruled. No objection was made to any instruction given the jury and no requested instruction was refused.

The morass out of which this information arose may be thus briefly described: Through a series of corporation organizations and transformations, here immaterial, there came into being the Crown Hill Cemetery Association (hereinafter referred to as the Cemetery Association), operating a cemetery and building a million dollar mausoleum, and Associated Industries, another corporation, which owned practically all the stock of the Cemetery Association. One Crane, who was the Crane of *Crane et al. v. People, supra,* became the president of Associated Industries, and one Flynn, who was the Flynn in that case, became treasurer, and Dill vice president. These men inaugurated and conducted a high powered stock selling campaign by which cemetery stock to the extent of two and one-quarter million dollars was unloaded on the public, and of that sum all but about $160,-000 was paid in. Then the Cemetery Association went into receivership, Associated Industries failed, and the whole structure collapsed.

The contentions made and argued, under the assignments herein, may be thus briefly summarized: (1) The demurrer to the information should have been sustained; (2) the motion to quash should have been sustained; (3) defendant's objection to the filing of the answer to the plea in bar should have been sustained; (4) defendant's

motion for a directed verdict, presented at the close of all the evidence, should have been sustained; (5) a separate verdict on the plea in bar should have been required; (6) a private conference, which the trial judge held with a juror, was prejudicial to defendant. These carry with them all the minor questions presented.

1. The only questions raised under the demurrer, not considered under the motion to quash, are: That the statute does not require an allegation of criminal intent; that the information contains no such allegation; and that the information does not charge the complainants suffered a loss. Said section 6946, reads: "Every person who shall obtain, or attempt to obtain, from any person or persons, any money, property or other thing or things of value by means of the sale, or the offer to sell, stock, shares or rights in, in or to any corporation, by any swindling or cheating transaction, shall be liable to indictment, and upon conviction, shall be punished by imprisonment in the penitentiary for any term, not less than one year nor more than ten years." The following section, 6947, Id., provides how an information under the preceding shall be drawn and what it shall contain. The information before us strictly conforms thereto.

In statutory crimes intent is not a necessary element. If it were, here it is covered by the words "swindling or cheating." 8 R. C. L., p. 62, §12; *McCausland v. People,* 58 Colo. 303, 305, 145 Pac. 685; *Harding v. People,* 10 Colo. 387, 394, 15 Pac. 727.

2. It is said that this act, which is chapter 197, p. 678, S. L. 1919, contravenes section 1, article VI of the state Constitution because section 3 thereof (§6948, C. L. 1921) provides that, "In all prosecutions under this act, the jury under the direction of the court, shall determine the law and the fact"; whereas said section of the Constitution provides that the "judicial power" of the state shall be vested in certain specified courts. Said section 3 follows the language of section 10, article II of the Constitution relating to prosecutions for libel. These being

the only cases in which power to determine the law is vested, by the Constitution, in the jury, it seems clear, both under the unbroken practice since our Constitution was adopted and under the rule of interpretation *expressio unius exclusio alterius,* that in so far as said section 3 attempts to confer upon juries power to determine the law, it is unconstitutional. Moreover, under the common law the facts were for the jury and the law for the court. 16 C. J., p. 921, §2272. From territorial days to the present it has been declared that criminal trials shall be conducted according to the course of the common law. R. S. 1868, p. 243, §216; C. L. 1921, p. 1819, §7099; S. L. 1925, p. 227, c. 84, §1. But since said section 3 is in no respect essential to the remainder of the act, and there is no reason to imagine that the legislature would not have passed it with that section eliminated, the act stands without it. *Greeley T. Co. v. People,* 79 Colo. 307, 312, 245 Pac. 720. Moreover, since in the instant case the court did determine the law and the jury the facts, and since Dill neither objected to that action nor sought any other, no prejudice to him appears.

■ It is also contended that this statute is so ambiguous, unintelligible and uncertain as to render it void. We cannot find these defects.

■ 3. The statute of limitations in question is section 7061, p. 1811, C. L. 1921. Dill's failure to file his plea in bar until the day of the trial, his failure to ask time after the answer thereto was filed, the overwhelming evidence in support of that answer, the submission, without objection, of the question thereby raised, to the jury and its verdict against him thereon, would seem to dispose of this contention, or at least bring it within the provision of section 7068, p. 1813, C. L. 1921, that no "writ of error shall be sustained for any matter not affecting the real merits of the offense charged."

That the charge fell within the statute appeared of record. In such cases the general rule is that no special plea is necessary. *People v. Harding,* 53 Mich. 481, 484,

19 N. W. 155. The rule applies to the defense of the statute of limitations. *State v. Rook,* 61 Kan. 382, 59 Pac. 653. In this state a defendant may plead the statute specially or meet the question by evidence under the general issue. If he plead the statute the prosecutor should reply with the exception. If he files no plea, but offers evidence, the prosecutor may meet that with evidence in rebuttal showing the exception. *Packer v. People,* 26 Colo. 306, 57 Pac. 1087.

It thus appearing that the issue was one which need not be raised by special plea it was within the court's discretion to permit the filing of the answer thereto after the jury was sworn, particularly where the plea was withheld until the beginning of the trial. *Collins v. People,* 69 Colo. 353, 195 Pac. 525.

4. It is contended that the only evidence which tends to support the charge of cheating or swindling is that of an unfulfilled promise by Associated Industries to make a loan to the Cemetery Association. There was such a promise and such failure. The people, however, expressly disclaim anything by reason thereof. They say that the evidence shows defendant directly responsible for false representations made to purchasers that the proceeds of sales of cemetery stock were being, and would be, devoted wholly, or practically so, to the erection of a mausoleum, whereas the commissions for such sales had been boosted from a contract rate of 16 per cent to an actual rate of 30 per cent; that while the expenses alone of such stock sales ran over $700,000, (which was more than 30 per cent of the receipts) only a little over $300,000 went to the Cemetery Association in the form of a loan, and the balance of said proceeds were absorbed by Associated Industries in its other activities. No other conclusion can be reached from this record. Associated Industries simply robbed its child. The motion for a directed verdict was properly overruled.

5. No separate verdict on the plea in bar was requested, no objection was made to the court's instruc-

tions submitting to the jury, under the general issue, the question presented by the plea and answer, and from what has heretofore been said it is apparent that the procedure followed was correct.

6. Being informed that juror E had talked with one Mc, a friend of Dill, the trial judge conferred with counsel in chambers and as a result thereof, and without objection, interviewed the juror alone. Dill's attorneys first raised the question by their motion for a new trial. They say they "were under the coercion of their personal desire to have the matter cleared up and did not resist the proposal of the court" to hold such conference. The motion was supported by affidavits and opposed by an unverified answer filed by the district attorney. A hearing was had on the motion at which E and three of his fellows were sworn and examined and at the conclusion of which the judge stated his recollection and found that the verdict was not influenced by the conference and that Dill had suffered no prejudice. The following conclusions seem inevitable from the record: The conference with the juror was suggested by Dill's counsel; the whole matter was unknown to Dill until after the verdict; the judge asked E if he had talked with Mc and the juror answered that he had not and that he did not even know the man; he was directed by the judge to return to the jury room and say nothing about the conference to the other jurors; this direction he followed; the conference was held after all the evidence was in and lasted less than five minutes; E was not advised of the source of any information the judge had nor that a complaint had been made; the judge promptly reported the substance of the conversation to Dill's counsel who made no objection and took no action; some of the jurors had, by mere accident, seen newspaper headlines, reading, "Charge of Jury Fixing is made at Dill Trial," and, "District Attorney charges Jury Tampering in Dill case," and there was some discussion of these by some of them. In view of the foregoing we concur in the

court's conclusion of want of prejudice. The question here presented has been settled by this court. *Holland v. People*, 30 Colo. 94, 105, 69 Pac. 515.

■■■■ However, we again call the attention of the trial judges to our warning to be found in our opinion in the Holland case, page 106, and in that in *Moffitt v. People*, 59 Colo. 406, 414, 149 Pac. 104.

Finding no reversible error in this record the judgment is affirmed.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE BOUCK not participating.

MR. JUSTICE BUTLER sitting for MR. CHIEF JUSTICE ADAMS.

MR. JUSTICE HILLIARD dissents.

MR. JUSTICE HILLIARD, dissenting.

I think the assignment challenging the conduct of the trial judge in holding a private conference about the case with one of the jurors, should be sustained.

The story is remarkable. About two o'clock of the last day testimony was taken, and when court was about to convene for the afternoon session, the district attorney in chambers, in the presence of counsel for defendant, newspaper men and others, stated that juror Etheridge had been in conversation with one McCulloch, a friend of the defendant; that counsel for defendant asked that the district attorney support his statement, which was not done; that the judge stated it would be necessary to inquire about the matter, either of the juror alone, or in the presence of the other jurors; that finally the judge determined that at the close of all testimony, then nearing conclusion, he would call the juror into chambers and interrogate him; that about 3:30, the parties having rested, the court cautioned the jury in the usual manner, ordered it to the jury room, not thereafter to be allowed to separate, an order not previously made during the

several days' trial; that shortly afterward the judge directed a bailiff to call juror Etheridge out from his fellows, for an interview in chambers; that in the course thereof, with only the judge and juror present, the judge asked the juror if he recalled the caution given to the jury from time to time not to discuss the case, to which the juror answered in the affirmative; that the juror was then asked whether he had discussed the case with any person, which was answered in the negative. The judge asked the juror if he recalled meeting a gentleman on certain steps of the court house and having a conversation with him. Again the answer was no. The judge, persisting, endeavored to describe a man and asked if the juror had not talked with him. The answer being in the negative, the judge became more specific and asked if the juror knew or had talked with a Mr. McCulloch, and he said not. Without in any manner indicating what he thought of the juror's answers, and preparatory to closing the interview, the judge said to him: "Now, Mr. Etheridge, we do not care to disturb the other jurors with this little inquiry; you will please say nothing about this, and may I have your word of honor as a man, as a citizen and as a juror that you will not say anything to the other jurors?" The juror gave assent, and was ordered back to the jury room where his brethren awaited. The court called all counsel to his chambers and related the conversation had with the juror, saying to the district attorney, "I guess this is a dud." The district attorney did not pursue the issue further.

It also appears that the newspaper men present when the district attorney made his unsworn and unsupported reflection on the juror, were not so lacking in appreciation of news value as to neglect to give the matter publicity. It appeared in a newspaper of general circulation, under such headlines as "Charge of Jury Fixing is made at Dill Trial." "District Attorney asks Judge to Question Juror." In the course of the article the name of the juror was given. Some of the jurors testified that they

read the headlines, and others discussed the matter with those who had read, to which they reacted variously, the whole being more or less disturbing to the entire body. All that took place occurred out of the presence of the defendant, and without his knowledge or consent. He first learned of it after the verdict had been received.

The motion for new trial was supported on this point by affidavits of the defendant and both his counsel, and by oral testimony of four jurors. The district attorney offered no sworn showing in opposition. He was permitted, however, to file his own unverified statement, which was given credence below, and is dignified with qualities of verity here. I cannot think it should have been filed or considered. For some undisclosed reason the official prosecutor was as chary of swearing to anything at this stage as when he precipitated the inquiry in the first instance. Why such a record should not have caused the trial judge to give pause, or why this court does not rise to the challenge on review, will, as I appraise the rights of the citizen whose liberty hangs in the balance, claim my thought to the end. It is true that counsel for defendant did not formally object to the inquiry, but they explain that the situation made them fearful that any objection on their part would reflect adversely on themselves and possibly militate against their client. Perhaps other counsel would have proceeded otherwise. I cannot say. The matter was in chambers, not in court, and as we have seen, the defendant was not present. To require defendant's counsel to meet the dilemma was not fair, and we should not feel powerless to afford relief.

The record does not warrant the statement in the opinion that "the conference with the juror was suggested by Dill's counsel." The sole basis for that assertion is the unverified word of the district attorney. Both attorneys for defendant swear that, acting on the mere assertion of the district attorney that juror Etheridge had been talking with McCulloch, a friend of the defend-

ant, the judge determined on the indicated course. In his summation the judge says that the method adopted came of a "hodgepodge" of suggestions. The newspaper reporter, present when the district attorney introduced the subject, wrote for his paper that "the district attorney asked that Michael O. Etheridge, juror No. 5, be questioned by the court." Exhibit 50. Considering that the reporter wrote contemporaneously with the event, and that the logic of the situation is that the district attorney prompted the inquiry, the fact should not be in doubt. It is gravely wrong, I think, to say Dill's counsel suggested the conference the judge had with juror Etheridge.

In light of the fact that the court had ordered the jury to remain together, presumably justified on the theory that it were better to avoid chance of improvident conversation by the individual jurors, I am at a loss to understand how the judge thought it within his province to call a juror from the presence of the remaining jurors for any purpose, and particularly to talk privately with him about the case. Is it to be supposed that the other jurors were without curiosity and free from wonder? Shall we conclude they were incapable of speculating on what it meant? Was their curiosity abated when later in the day they saw headlines in a newspaper to the effect that the district attorney had asked the judge to question one of the jurors? Was it helpful to the course of justice, the circumstances considered, to pledge the interrogated juror to secrecy in his communication with his fellows? Let it be borne in mind that the judge did not say to the juror he stood absolved from suspicion. On the contrary, with no assurance of the Judge's faith in his probity, he was sent back to the jury room, there to meet the inquiring eyes, likely the vocal questions, of his brother jurors, with judge enjoined silence. Who is qualified to say that thereafter this juror was free to exercise the independence of judgment that is the glory of our jury system? Indeed, who may be so sure of his premise as to say the incident did not prejudicially dis-

turb the serenity of the entire jury? The judge thinks that since he did not intimate to the juror "whether he was talking about a complaint, or a complaint by the district attorney or a complaint by the defendant," the juror was not aware of the implications involved. I cannot so appraise the intelligence of the juror. It is not denied that during the trial McCulloch had been referred to as a friend of the defendant, and although the juror could well answer the judge that he did not know McCulloch, as he did, still it is not to be supposed he had forgotten the reference made to that gentleman at earlier stages of the trial. All the circumstances considered, the only fair inference is that the juror knew he had been charged with talking with the man McCulloch, a charge that only the district attorney would be interested in preferring. Resting under such imputation, thus emanating, privately catechised by the judge, and marked by his fellows, the interrogated juror was "placed under bonds * * * to go against the prisoner, in order to free himself from the charge made against him." *Lamar v. State,* 64 Miss. 687, 2 So. 12. It seems desirable to quote fully from the Mississippi case. The court said:

"After the jury had been sworn, and witnesses had been examined, the district attorney announced to the court (the jury not being present) that he had learned since the acceptance of the jury that one of their number, Mr. Adams, had, before he went into the jury box, declared that if he got on the jury he would hold the jury until hell froze over or acquit prisoner, and it also appeared from a subpoena that Adams had been summoned as a witness for the defendant, of which the district attorney had been ignorant when the jury was impaneled. Thus moved by the district attorney, the court investigated the matter and announced a willingness to discharge the juror and begin the trial anew with another jury, and the district attorney withdrew his objection to the juror and asked to proceed with the trial as if no

interruption had occurred, and it was done; the jury was brought in and the trial proceeded.

''After much testimony had been given, and on a subsequent day of the trial, the district attorney called the juror Adams to the witness stand, and after he was sworn as a witness, asked him if he did not go to the jail in company with one Fryley, and if the prisoner did not ask them to conspire to acquit him by Adams' going on the jury and Fryley appearing as a witness; and after failing to elicit anything improper in the conduct of Adams at the jail, the district attorney asked him about being summoned as a witness and then asked him if he had ever said to anybody that he intended to get on this jury, and hold it until hell froze over, to which he replied in the negative. When the juror Adams was sworn as a witness and counsel for the prisoner objected to the examination, the court ordered the other jurors to retire from the court room, which they did; and when the examination of Adams was concluded the other jurors were brought back and told by the court that what had transpired while they were absent was not a matter of any concern to them, and that they should not know anything of it. The trial was then proceeded with, and concluded without further interruption.

''* * * The object of this examination was not to determine as to a mistrial, by withdrawing Adams from the jury. The thought of that had been abandoned, as we assume, and the only explanation suggesting itself to account for this interrogation of the juror Adams as a witness is that the district attorney, shrinking from the consequences of a mistrial against the consent of the accused, and fearing lest the juror Adams was on the jury predetermined to acquit, resolved on the course pursued, to acquaint Adams and his fellows with the fact that he was under suspicion, and that information had been received which directed the investigation made. The influence of this proceeding on the jury may be supposed to have been unfavorable to the free and unconstrained ac-

tion of its members. The suspect, 'Adams,' was thereby placed under bonds, as it were, to go against the prisoner, in order to free himself from the charge made against him, and the other jurors were made to feel, as we may suppose, that they were in some manner implicated as members of a panel which was under suspicion by the officers and the public.

"The legal theory of a trial by jury is the selection of an impartial body from the county, and its trial of the case free from any influence except that produced by the testimony and law and legitimate argument, and any subjection of the jury to any other influence is carefully guarded against. Twelve * * * men, elected, impaneled, and sworn to try the issue joined, must concur in a verdict of guilty before the humblest can by our law be deprived of his liberty; and such is the jealousy with which trial by jury is guarded that, when it is made to appear that anything has occurred which may have improperly influenced the action of the jury, the accused will be granted a new trial, although he may appear to be ever so guilty, because it may be said that his guilt has not been ascertained in the manner prescribed by law, and every one is to be judged by the law."

Nor was the Mississippi court intrigued with the argument "that the effect of the proceeding was merely to impress on the jury a sense of duty; and, as it led them to a correct result, no harm was done." It considered the record for error of law as is the proper office of appellate tribunals.

The inquiry conducted privately by the judge was of supreme importance to the defendant here. In my view, on the simple statement of the district attorney, it should not have been held at all, certainly not other than in open court, nor in the absence of the defendant. His counsel could not waive it, nor did they. Indeed, as the United States Supreme Court has held, it was not within the power of the accused himself to do so. *Hopt v. People,* 110 U. S. 574, 4 Sup. Ct. 202. The practice there pro-

vided for the trial of challenges to jurors by three impartial triers. Some challenges made in the case were so tried, but conducted before the triers in the absence of the defendant. The court, speaking by Mr. Justice Harlan, said:

"No objection was made to the triers leaving the court room, nor was any exception taken thereto during the trial. The jurors proposed were examined by the triers, without any testimony being offered or produced, either by the prosecution or the defense.

"It is insisted, in behalf of the defendant," said the court, "that the action of the court in permitting the trial in his absence of these challenges of jurors, was so irregular as to vitiate all the subsequent proceedings. This point is well taken." "We are of opinion," the court further said, "that it was not within the power of the accused or his counsel, to dispense with * * * his personal presence at the trial. The argument to the contrary necessarily proceeds upon the ground that he alone is concerned as to the mode by which he may be deprived of his life or liberty, and that the chief object of the prosecution is to punish him for the crime charged. But this is a mistaken view as well of the relations which the accused holds to the public as of the end of human punishment. * * * If he be deprived of his life or liberty without being so present, such deprivation would be without that due process of law required by the Constitution." In 16 R. C. L. 298, §110, is the statement: "In numerous cases it is held that private conversations of the judge and the jury are not only improper, but that they constitute misconduct for which the judgment will be reversed, without reference to the question whether such misconduct affected the verdict, inasmuch as injury in such cases will be presumed; and authority is not wanting to the effect that this presumption is conclusive." See, also, *Crabtree v. Hagenbaugh*, 23 Ill. 349; *Texas Midland Railroad Co. v. Byrd*, 102 Tex. 263, 115 S. W. 1163, 20 L. R. A. (N. S.) 429; *Read v. City of Cam-*

*bridge,* 124 Mass. 567; *Collins v. State,* 99 Miss. 47, 54 So. 665; *State v. Murphy,* 17 N. D. 48, 115 N. W. 84.

In the opinion the court cites *Holland v. People,* 30 Colo. 94, 69 Pac. 519 and *Moffitt v. People,* 59 Colo. 406, 149 Pac. 104, cases relied on by the attorney general. In neither of those cases was the situation comparable to this record. In the Holland review the entire jury came into court because of the illness of one of their number. The defendant and his counsel were absent. After disposing of that which prompted the jury's presence, the court learned on inquiry that the jury was not ready to report, and that whatever disagreement obtained was upon questions of fact. The court then asked whether the "bailiffs or any other person had sought in any way to intrude upon their deliberations, or to address them in reference to the case," and each juror answering in the negative, the court directed the jury to retire. The discussion indicates that even there the court experienced difficulty in affirming the judgment, and paused to indulge a pointed warning to the trial judge. If instead of inquiring generally of the entire jury, the judge had sent for one of their number and interviewed him privately as to whether he had been in conversation with a designated friend of the defendant in the manner of the record here, does it seem reasonable to believe the court would have been satisfied with administering a lecture to the judge? I submit not. The Moffitt inquiry disclosed a prosecution against Moffitt and another on two counts. After the jury's retirement they summoned the judge to the jury room, and first informing him they had found the defendants guilty on the first count, stated they were unable to agree as to one of the defendants on the second count and inquired as to what form of verdict should be used, etc., and the judge advised on the point. In the opinion it is noted that finally as to the second count there was acquittal, and that in his brief counsel for defendants "conceded that nothing detrimental to the defendants appears to have taken place." The court criti-

cising the trial judge in language well worth reading, affirmed the judgment, but in doing so, emphasized that it was because "there is no claim that defendants' rights were in any manner prejudicially affected." That in those cases the trial judges were criticised indicates that what they did was highly irregular, as of course it was, and but for the fact the court was able to discern from the record that which affirmatively showed lack of prejudice, reversal would have been ordered. We said in *Dekelt v. People,* 44 Colo. 525, 531, 99 Pac. 330, that "Error is presumed to be prejudicial unless it affirmatively appears that it was not. We cannot say from the record before us that the defendant was not prejudiced by the action of the court under consideration." This wholesome doctrine was approved in *Dickens v. People,* 67 Colo. 409, 415, 186 Pac. 277.

For the trial judge to say that the interview he held with juror Etheridge was not prejudicial, was conjecture, and for us to adopt that view is of like quality, and violates every study of psychology. The statement in the opinion that the judge is "warned," is void of force. The function of a reviewing court is to correct error, not to complain of it.

## On Motion to Stay Remittitur and Correct Mandate.

MR. JUSTICE BURKE.

On the day on which a rehearing was denied herein counsel for defendant moved that the remittitur be stayed, pending further hearing, and that thereupon the cause be remanded "with directions to dismiss the action or for a new trial." That motion was based upon the following facts:

There are seven justices of this court. When this cause was decided two of them, Mr. Chief Justice Adams and Mr. Justice Bouck, for reasons satisfactory to them and of which they must, in the instant case, be the sole judges,

did not participate. Of the five participating, one, Mr. Justice Hilliard, dissented. On the motion for rehearing Mr. Justice Holland joined in the dissent of Mr. Justice Hilliard. Hence the rehearing was denied en banc by a court of five justices, two of whom dissented. In other words the number of justices concurring in the affirmance of the judgment would not constitute a majority of the full bench if all the members of the court sat in the case.

"No punishment shall be inflicted in any case brought before the supreme court under the provisions of this chapter, unless a majority of the justices of said court concur in respect to such punishment." C. L. 1921, p. 1823, §7116. On that statute counsel for defendant rest their present motion and request that all the justices participate in its consideration and determination. Mr. Chief Justice Adams and Mr. Justice Bouck, however, adhere to their conclusion that they ought not sit.

 The existence of said statute is the first question which confronts us, for if, as we conclude, it has been repealed, its applicability here, were it still in force, is immaterial.

It will be noted that it was limited in its operation to cases "brought before the supreme court under the provisions of *this chapter*." To determine whether the instant case was so brought we must first ascertain what was meant by "this chapter."

We find the chapter, as originally passed, is unnumbered. It appears at page 91 of the Territorial Session Laws of 1865 in an act of five short sections in which this is section 2. The remainder of the act provides a method of bringing before the Supreme Court for review all prosecutions "by indictment" (information). But such cases are no longer brought before the Supreme Court under the provisions of that act.

In 1868 a new criminal code was passed. It is found at page 196 of the Revised Statutes of 1868, and was never published separately. As a part thereof, on pages

246 and 247, are to be found sections 226 and 227 of the act which provide a new way of prosecuting writs of error in criminal cases; dividing them into capital cases covered by section 226, and cases not capital covered by section 227; and although it will be observed by reference to section 246 of the same act, page 254 R. S. 1868, that there was no specific repeal of the said act of 1865, yet there must be a repeal by implication because the same subject is covered in a different way.

It therefore follows that since the passage of the criminal code of 1868 no cases have ever been brought before the Supreme Court under the act of 1865, in which this section appears and to which alone it refers. This is unquestionably the reason why the act of 1865 was not published in the General Laws of 1877.

It would further appear that the compiler of the Revised Statutes of 1868 overlooked the situation above mentioned and inserted therein the act of 1865, including the section in question. It is to be found as sections 66 and 67 on page 520 of the Revised Statutes of 1868 where it appears as the two last sections of chapter LXX relating to "practice," and beginning on page 498 of that volume. Upon examination it will be observed that the first 65 sections of that chapter relate solely to civil cases. In other words these two sections on criminal practice, already clearly repealed, were inserted by the compiler as the closing sections of a chapter on civil practice. The new act of 1868, governing writs of error in criminal cases, appears as sections 831 and 832, beginning on page 326, of the General Laws of 1877.

Notwithstanding the republication of the section here in question in all recent compilations the fact that for more than sixty years it seems never to have been invoked by the bar and has been consistently ignored by this court reenforces our present conclusion. *Covington v. People,* 36 Colo. 183, 85 Pac. 832; *Walt v. People,* 46 Colo. 136, 104 Pac. 89; *DeRinzie v. People,* 56 Colo. 249, 138 Pac. 1009; *Webber v. People,* 66 Colo. 213, 169 Pac.

649; *Robinson v. People,* 76 Colo. 416, 232 Pac. 672; *Ball v. People,* 86 Colo. 387, 281 Pac. 745; *Andreen v. People,* 91 Colo. 341, 14 P. (2d) 695.

 For the reasons given the motion is overruled and the remittitur will issue.

MR. JUSTICE BUTLER, sitting for MR. CHIEF JUSTICE ADAMS, and MR. JUSTICE CAMPBELL concur.

MR. JUSTICE HILLIARD and MR. JUSTICE HOLLAND dissent.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE BOUCK not participating.

MR. JUSTICE HOLLAND, dissenting.

My convictions impel me to briefly state my reason for withdrawing my concurrence in the majority opinion and joining in the dissenting opinion by Mr. Justice Hilliard.

Consideration of the petition for rehearing in this case convinced me that the defendant should have the benefit of a new trial that would be free from prejudice as is every person's right. I am firmly convinced that the incident during the trial, relative to the interrogation of one of the jurors by the trial judge, could have in no way been of benefit to the defendant as is evidenced by the verdict. I am equally convinced that no one can fully appraise the possible prejudice to the defendant as a result thereof. As we understand the natural workings and tendencies of the human mind, it must be said that this particular juror, if not the entire jury, was not free to follow an unobstructed course in his or their deliberations. This happening unmistakably was an influence outside of the sole influence, that of the evidence, upon which a verdict must be based.

Where life and liberty are at stake, in a properly conducted trial, the presence of the defendant is indispensable at every stage of the proceedings. This is vouchsafed to him under the law. In this instance, he was de-

prived of that cardinal rule which is of fundamental importance.

While it would have its influence upon, and arose in this case, another vital question rests with the denial of the petition for rehearing. A motion was filed to stay the remittitur calling the court's attention to the following statute: "No punishment shall be inflicted in any case brought before the supreme court under the provisions of this chapter, unless a majority of the justices of said court concur in respect to such punishment." C. L. '21, §7116.

The rehearing was denied by three justices of the court, two justices dissenting. Separate and apart from the case at bar, and as it may affect all such matters pending in this court, it is my opinion that the question arising under the statute above quoted, can only be disposed of by a majority of all the justices of the court. Rules of this court are not made by less than a majority of the court. It cannot be said that the question herein raised was of secondary importance to the court's own rules.